UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN, and the DISTRICT OF COLUMBIA, ex rel. CHRIS WIBLE,<br><br>                                     Plaintiffs,<br><br>vs.<br><br>WARNER CHILCOTT,<br><br>                                     Defendant. | Case No.<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT AND STATE FALSE CLAIMS ACTS<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator Chris Wible, through his attorneys Phillips & Cohen LLP, on behalf of the United States of America (the "Government," or the "Federal Government"), and the States of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, and the District of Columbia (collective "the States"), for his Complaint against defendant Warner Chilcott ("Defendant"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.      INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and

1

caused to be made by Defendant and/or its agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3279 et seq. ("the FCA").

2.      As detailed below, Defendant Warner Chilcott has illegally promoted the osteoporosis medications Actonel and Atelvia with false claims of superiority to their competitor drugs (generic Fosamax and Boniva). Despite the lack of any head-to-head trials, or any other substantial clinical evidence, the company promotes the drugs as having a superior "mechanism of action" to the other drugs in the class. Defendant has also illegally promoted Atelvia as improving patient compliance, despite the lack of substantial clinical evidence.

3.      Furthermore, Defendant has used kickback schemes, including numerous expensive physician dinners, speaker payments and billing assistance to induce physicians to increase the number of prescriptions written for Defendant's products.

4.      Federal and state health care programs have spent hundreds of millions of dollars in the reimbursement of Defendant's products. For example, in 2010, according to state drug utilization data, Medicaid alone reimbursed approximately $13.8 million for Actonel prescriptions. As osteoporosis drugs, a high percentage of prescriptions for the products come from Medicare as well.

5.      Actonel and Atelvia are more expensive than their competitor drugs, particularly Fosamax, for which there has been a generic since February of 2008. For example, in 2010, Medicaid reimbursed an estimated $3.56/unit of 5 mg Actonel, the daily dosage. In the same year, Medicaid reimbursed approximately $1.03/unit of 10 mg Fosamax (branded), also the daily dosage, and $0.54/unit of 10 mg generic Fosamax.

6.      The FCA was enacted during the Civil War, and was substantially amended in 1986, and 2009. Congress amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the government

2

without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

7.     The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. §3729(a)(1)(G) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. §2461 note; Public Law 104-410]).

8.     The FCA allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

9.     Numerous states have enacted laws similar to the FCA to enable them to recover for fraud affecting state treasuries. Mr. Wible alleges that Defendant's conduct violated the FCA; the California False Claims Act, Cal. Gov't. Code §§ 12650 et seq.; the Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a et seq.; the Delaware False Claims and False Reporting Act, 6 Del. C. §§ 1201 et seq.; the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1-8; the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 et seq.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 et seq.; the Maryland False Health Claims Act, Md. HEALTH-GENERAL Code Ann. §§ 2-601 et seq.; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §§ 5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 et seq.; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 et seq.; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010 et seq.; the New Hampshire False Claims Act, N.H.

3

Rev. Stat. Ann. §§ 167.61 et seq.; the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 et

seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 et seq.; the New

York False Claims Act, N.Y. State Fin. §§ 187 et seq.; the North Carolina False Claims Act,

N.C. Gen. Stat. §§ 1-605 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§

5053 et seq.; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 et seq.; the

Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.; the Texas

Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 et seq.; the Virginia

Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq.; Wisconsin False Claims for

Medical Assistance Act, Wis. Stat. §§ 20.931 et seq.; and the District of Columbia Procurement

Reform Amendment Act, D.C. Code Ann. §§ 1-1188.13 et seq.

      10.     Federal laws, rules and regulations make it illegal to seek federal reimbursement

for any prescription that was misbranded or obtained by the payment of a kickback.

      11.     Based on the foregoing laws, qui tam plaintiff Chris Wible seeks, through this

action, to recover damages and civil penalties arising from the false or fraudulent records,

statements and/or claims that Defendant knowingly made or caused to be made in connection

with its fraudulent scheme.

## II.    **PARTIES**

      12.     Plaintiff/Relator Chris Wible ("Relator") is a resident of Eugene, Oregon. Mr.

Wible has been a sales representative in Warner Chilcott's Southwest Region in the Primary

Care Division since August of 2010. At Warner Chilcott, Mr. Wible has been involved in the

sales promotion of Atelvia and Actonel, as well as other drugs. Prior to joining Warner Chilcott,

Mr. Wible worked as a pharmaceutical sales representative for Pharmacia beginning in February

of 2000, and later Pfizer, following the company's purchase of Pharmacia in 2003. Mr. Wible

has also worked in sales at General Mills and Phillip Morris.

      13.     The governmental plaintiffs in this lawsuit are the United States and the States of

California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana,

Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New

Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas,

Virginia, Wisconsin, and the District of Columbia.

14.     Defendant Warner Chilcott PLC ("WC" or "Defendant") is a global

pharmaceutical company headquartered in Ireland with its US headquarters located at 100

Enterprise Drive, Rockaway, New Jersey, 07866. WC employs approximately 1,200 sales

representatives and markets its products throughout the United States. On October 30, 2009, WC

acquired Proctor & Gamble's global branded prescription pharmaceutical business for $3.2

billion. In 2010, WC's net sales totaled over $2.8 billion.

## III.     **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31

U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or

transactions" in this Complaint. Even if there had been any such public disclosure, Mr. Wible is

the original source of the allegations herein because prior to any relevant public disclosure, he

has voluntarily disclosed to the Government the information in which the allegations or

transactions in his claims are based, and/or because he has knowledge that is independent of and

materially adds to any publically disclosed allegations or transactions relevant to his claims, and

has voluntarily provided the information to the Government before filing this action.

16.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. §

3732(a) because that section authorizes nationwide service of process and because the Defendant

has minimum contacts with the United States. Moreover, the Defendant can be found to have

transacted business in the District of Massachusetts.

17.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §§ 1391(b)

and 1395(a) and 31 U.S.C. § 3732(a) because the Defendant can be found in and/or transacts or

has transacted business in this district. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this district, maintained employees and offices in this district, and/or made significant sales within this district.

## IV.    APPLICABLE LAW

### A.    The FDA Regulatory Scheme

18.    Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses and approves the labeling (hereafter, "product insert") to be disseminated with the drug. Id. § 355(a) and (d). The FDA's approval of a drug is the final stage of a multi-year process of study and testing.

19.    The drug's product insert must contain specific information about the drug, including its approved indication(s) and its mechanism of action, that is, the specific biochemical interaction through which a drug produces its pharmacological effect. 21 C.F.R. § 201.57(c)(2) and (c)(13)(ii)(A). The FDA will only approve a new drug application if the product insert contains accurate information supported by substantial clinical evidence.

20.    Any statements comparing the safety or effectiveness of a drug with other agents for the same indication will generally be included in the indication section of the product insert, and must be supported by substantial evidence derived from adequate and well-controlled studies. Id. § 210.57(c)(2)(iii).

21.    The FDCA prohibits the "alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, *or the doing of any other act with respect to*, a food, drug, device, or cosmetic, if such act is done while the article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." Id. § 331(k) (emphasis added).

6

22.    The FDCA prohibits the introduction of misbranded pharmaceutical products into interstate commerce. 21 U.S.C. § 331(a). Likewise, misbranded products may not be sold after interstate shipment of the product. Id. § 331(c).

23.    A drug is misbranded if its labeling is "false or misleading in any particular." Id. § 352(a). Thus, a drug is misbranded if the labeling represents or suggests that a drug is safer or more effective than another drug, when this has not been demonstrated by substantial evidence or substantial clinical experience. 21 C.F.R. § 201.6(a) ("Among representations in the labeling of a drug which render such drug misbranded is a false or misleading representation with respect to another drug or a device or a food or cosmetic.")

24.    The drug's labeling includes, but is not limited to, the product insert in the drug's package. The FDCA defines labeling to include "all labels and other written, printed, or graphic matter...accompanying a drug." Id. § 321(m). Regulations further explain that labeling includes, "[b]rochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug...published for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug..." 21 C.F.R. § 202.1(l)(2).

25.    Federal regulations also limit the form and content of the information a manufacturer may disseminate to physicians through advertisements. FDA regulations specifically prohibit advertising that:

> [c]ontains a drug comparison that represents or suggests that a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience.

21 C.F.R. § 202.1(e)(6)(ii).

26.    The FDA interprets the term "advertisement" broadly, to include not only written information promoting the product, but any "information (other than labeling) that originates

7

from the same source as the product and that is intended to supplement or explain the product."
62 Fed. Reg. 64,074, 64,076 (1997). Thus, advertisements include oral statements made by
manufacturers' sales and marketing agents. On a number of occasions, DDMAC has prohibited
manufacturers from making unsubstantiated claims of superiority.

27.     As with labeling, prescription drug advertisements that are false or misleading
cause the drug to be misbranded.

## B.     Federal Health Care Programs

28.     The federal and state governments reimburse prescription drugs under several
health care programs, including, but not limited to, Medicare, Medicaid, CHAMPUS/TRICARE,
CHAMPVA, the Federal Employees Health Benefit Program, federal workers' compensation
programs, and comparable state programs. A significant portion of Actonel and Atelvia
prescriptions are reimbursed by one or more of these programs.

29.     Whether a drug complies with FDA regulations will largely determine whether a
prescription is eligible for reimbursement by federal and state health care programs. Once a drug
has been misbranded, it is no longer eligible for introduction into interstate commerce, and, thus,
no longer "approved" by the FDA. Consequently misbranded drugs are not "covered drugs"
under federal and state health plans, and reimbursement claims submitted to federal or state
health plans for misbranded drugs constitute false or fraudulent claims for reimbursement.

### 1.     The Medicaid Program

30.     Medicaid is a public assistance program providing for payment of medical
expenses for low-income patients. Funding for Medicaid is shared between the federal
government and state governments. The Medicaid program subsidizes the purchase of more
prescription drugs than any other program in the United States.

31.     Although Medicaid is administered on a state-by-state basis, the state programs
adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that
the federal government will pay for through its funding of state Medicaid programs.

8

32.     Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §1396b(i)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are also defined as drugs with FDA approval. See 42 U.S.C. §1396r-8(k)(2)(A)(i) (defining a covered outpatient drug as one "which is approved for safety and effectiveness as a prescription drug under sections 505 or 507 of the Federal Food Drug and Cosmetic Act or...under section 505(j) of such Acts").

2.     The Medicare Program

33.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.

34.     The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

35.     The Medicare Program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

36.     The Medicare Prescription Drug Improvement and Modernization Act of 2003 added prescription drug benefits to the Medicare program under Part D. Since January 2006, the Medicare Program has provided subsidized drug coverage for all beneficiaries.

37.     Individuals may have dual eligibility for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

9

3.    Other Federal and State-funded Health Care Programs

38.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to TRICARE, CHAMPVA, the Federal Employees Health Benefit Program, and federal workers' compensation programs.

39.    TRICARE, administered by the United States Department of Defense, is a federally-funded program that provides medical benefits to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees.

40.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

41.    The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

42.    The States provide health care benefits to certain individuals, based either on the person's financial need, employment status or other factors.  To the extent those programs are covered by that State's False Claims Act, those programs are referred to in this Complaint as "State-funded health care programs."

C.    **The Anti-Kickback Statute**

43.    The federal health care Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

10

44.     The Anti-Kickback statute ("AKS") prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be furnished under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, or other federal health care program.

45.     The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company to a physician which has as one of its purposes inducement of the physician to write additional prescriptions for the company's pharmaceutical products.

46.     Concern about improper drug marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback law. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the improper practices cited by the Inspector General are drug companies' payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor could generate for the drug company. Id.

47.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other state and federal health care programs. With regard to Medicaid, for example, each physician and pharmacist that participates in the program must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback provisions of the law. In Massachusetts and a number of other states, the

11

Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with Federal laws.

48.     In sum, either pursuant to provider agreements, claims forms, or other appropriate manner, pharmacists and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

49.     Claims that derive from referrals that are tainted by kickbacks are not eligible for reimbursement. Submission of such a claim for reimbursement constitutes a false or fraudulent claim under the federal False Claims Act, 31 U.S.C. § 3729.

## V.     BACKGROUND

### A.     Osteoporosis and Bisphosphonates

50.     Bone is a living tissue that changes through out one's life through two processes: bone modeling and bone remodeling. During childhood and adolescence, bones grow and shift in size by bone modeling, through which new bone is formed at one site while old bone is removed from another site within the same bone. Once the body reaches adulthood, the bone changes through bone remodeling, in which mature bone tissue is replaced with new bone tissue.

51.     The cells responsible for bone remodeling include osteoblasts, which secrete new bone, osteoclasts, which break bone down, and osteocytes, which detect and signal damage. In adults, a balance between bone resorption by osteoclasts and bone formation by osteoblasts maintains bone mass and skeletal integrity.

52.     Osteoporosis is characterized by the thinning of bone tissue and loss of bone mineral density over time. The disease leads to increased bone fragility, and consequent increase in the risk of fracture. Osteoporosis develops where there is a prolonged imbalance in bone remodeling, where bone resorption exceeds bone formation, such that spaces within the bone become enlarged, decreasing bone strength.

53.     There are two types of osteoporosis: primary and secondary.  More than 95% of osteoporosis is primary osteoporosis, which can be classified as: (1) type I or postmenopausal osteoporosis, resulting from the sharp decreases in bone mass as estrogen declines around and during the menopausal period; or (2) type II or age related osteoporosis, caused by the slow decline in bone mass over time, which begins around age 30 to 45.  Secondary osteoporosis refers to cases in which specific disease or other conditions cause loss of bone mass.

54.     Osteoporosis is diagnosed by measuring bone mineral density ("BMD"), which is the amount of bone mass per unit volume.  Osteoporosis is defined as having a BMD value $\leq$2.5 standard deviations below that of a normal young adult 30 years of age of the same gender and ethnic background.

55.     Fractures resulting from osteoporosis are generally classified as either vertebral (i.e., involving the spine) or nonverterbral.  Vertebral fractures are the most common single site of osteoporosis accounting for 27% of all fractures.

56.     There are two basic types of drug therapy for osteoporosis.  Antiresorptive drugs reduce bone loss by decreasing the activity of osteoclasts, while anabolic drugs build bone by stimulating osteoblasts preferentially over osteoclasts.

57.     The antiresorptive drugs include bisphosphonates, estrogens, and selective estrogen receptor modulators.  The drugs at issue in this complaint are bisphosphonates.

58.     The chemical structure of bisphosphonates, all of which contain two phosphate groups linked by a central carbon atom, allows them to bind to the surface of bone where they are taken up by osteoclasts.  Once inside the osteoclasts, the bisphosphonates inhibit a key enzyme, farnesyl pyrophosphate synthase (FPPS).  When FPPS is inhibited, osteoclasts become less active and eventually undergo cell death.  As a result, bone resorption and turnover are reduced.

59.     The bisphosphonates at issue in this complaint include Warner Chilcott's Actonel and Atelvia (both risedronate) as well as their competitors, Fosamax (alendronate) and Boniva

13

(ibandronate).  As detailed below, the Bisphosphonates' approved indications are varied.  For the purposes of this complaint, the significant differences are pursuant to the drugs' indications for postmenopausal osteoporosis.

60.     Fosamax, manufactured by Merck, was approved by FDA in 1995 for, among other things, "Treatment and prevention of osteoporosis in postmenopausal women" with the following indications:

- For the treatment of osteoporosis, FOSAMAX increases bone mass and reduces the incidence of fractures, including those of the hip and spine (vertebral compression fractures). Osteoporosis may be confirmed by the finding of low bone mass (for example, at least 2 standard deviations below the premenopausal mean) or by the presence or history of osteoporotic fracture.

- For the prevention of osteoporosis, FOSAMAX may be considered in postmenopausal women who are at risk of developing osteoporosis and for whom the desired clinical outcome is to maintain bone mass and to reduce the risk of future fracture. Bone loss is particularly rapid in postmenopausal women younger than age 60. Risk factors often associated with the development of postmenopausal osteoporosis include early menopause; moderately low bone mass (for example, at least 1 standard deviation below the mean for healthy young adult women); thin body build; Caucasian or Asian race; and family history of osteoporosis. The presence of such risk factors may be important when considering the use of FOSAMAX for prevention of osteoporosis.

61.     Among the bisphosphonates, Fosamax has been the market leader.  Fosamax was approved based on two clinical studies:  FIT 1 published in 1996 in The Lancet and FIT 2 published in 1998 in the Journal of the American Medical Association (JAMA).  In three years, Fosamax demonstrated a 47% reduction in vertebral fractures relative to placebo and a 51%

14

reduction in hip fractures. Fosamax did not demonstrate a significant enough reduction in non-hip nonvertebral fractures to receive that additional indication.

62. Fosamax went generic in February of 2008.

63. Boniva, manufactured by Roche, was approved by FDA in 2004 "for the treatment and prevention of osteoporosis in postmenopausal women. BONIVA increases bone mineral density (BMD) and reduces the incidence of vertebral fractures."

64. Boniva's approval was based on a study referred to as the "BONE" or "Chestnut" study published in the Journal of Bone and Mineral Research by Dr. Chestnut: "Effects of Oral Ibandronate Administered Daily or Intermittently on Fracture Risk in Postmenopausal Osteoporosis." Boniva demonstrated a 62% reduction in vertebral fractures when administered daily and 50% when administered intermittently relative to placebo. Boniva did not demonstrate a statistically significant reduction in nonvertebral fractures in the BONE study.

65. Actonel was approved by the FDA in 1998 for "the treatment and prevention of osteoporosis in postmenopausal women. In postmenopausal women with osteoporosis, Actonel reduces the incidence of vertebral fractures and a composite endpoint of nonvertebral osteoporosis-related fractures."

66. Atelvia was approved by the FDA in 2010 for "the treatment of osteoporosis in postmenopausal women. Bone mineral density increases achieved at one year with Atelvia are non-inferior to increases seen with risedronate sodium 5 mg (immediate-release) daily. Daily risedronate sodium 5 mg (immediate-release) has been shown to reduce the incidence of vertebral fractures and a composite endpoint of nonvertebral osteoporosis-related fractures."

67. Atelvia has the same active ingredient found in Actonel, risedronate, but also has an enteric coating, which delays the release of the active ingredient inside the body and may lessen Gastrointestinal Adverse Events associated with the other BP drugs.

68. Of the four drugs, only Atelvia and Actonel are approved for the reduction of both vertebral *and* nonvertebral fractures in postmenopausal osteoporosis. The indication was based on the results of two randomized, double-blind placebo controlled clinical trials: the VERT-NA

15

and VERT-MN studies which were performed by the Vertebral Efficacy with Risedronate Therapy (VERT) Study Group between 1993 and 1999. The VERT studies revealed that a 5 mg daily dose of Actonel was effective in reducing new vertebral fractures (the primary endpoint) throughout the 3-year studies.

69.     Secondary endpoints in the VERT trials included the incidence of new nonvertebral fractures and changes in BMD vs. baseline at multiples sites. Although the VERT-NA study was not powered to show a reduction in risk of nonvertebral fractures, the secondary endpoints results revealed that treatment with Actonel 5 mg reduced the incidence of nonvertebral fractures by 39% relative to placebo.

70.     In the VERT-MN study a 33% reduction in nonvertebral fractures was also observed but this was not statistically significant. However, analysis of pooled data from both VERT studies revealed a 36% reduction in risk for nonvertebral fractures. This 36% composite reduction in nonvertebral fractures was the basis for the nonvertebral indication for Actonel. The nonvertebral fractures included a composite number of fractures in multiple nonvertebral sites including wrist, humerus, clavicle, pelvis, hip, and leg.

71.     Because hip fractures cause more morbidity and mortality than other osteoporosis-related fractures, it is very important to determine whether an anti-osteoporosis drug can protect specifically against hip fractures.

72.     Fosamax has an approved indication for protection against hip fracture. Actonel did not have sufficient clinical data to receive FDA approval to claim efficacy in reduction in hip fractures.

73.     Despite the lack of an approved indication for protection against hip fracture for either Actonel or Atelvia, WC trains its sales representatives to promote the drugs as effective in reducing hip fractures, by informing physicians that a patient subgroup in the HIP study (published in the New England Journal of Medicine in 2001) demonstrated a statistically significant reduction in the risk of hip fractures from Actonel relative to placebo.

16

74.     In addition to the approved indications, the product insert for any pharmaceutical describes the drug's "mechanism of action." Although the wording varies, the "Mechanism of Action" on the Atelvia, Actonel, Fosamax and Bonival labels describes the same process: the bisphosphonate has an affinity for bone mineral (hydroxyapatite) and inhibits osteoclast activity, reducing bone resorption. The full "Mechanism of Action" from each label is as follows:

a)      [Atelvia and Actonel]

Risedronate has an affinity for hydroxyapatite crystals in bone and acts as an antiresorptive agent. At the cellular level, risedronate inhibits osteoclasts. The osteoclasts adhere normally to the bone surface, but show evidence of reduced active resorption (e.g., lack of ruffled border). Histomorphometry in rats, dogs, and minipigs showed that risedronate treatment reduces bone turnover (activation frequency, i.e., the rate at which bone remodeling sites are activated) and bone resorption at remodeling sites.

b)      [Fosamax]

Animal studies have indicated the following mode of action. At the cellular level, alendronate shows preferential localization to sites of bone resorption, specifically under osteoclasts. The osteoclasts adhere normally to the bone surface but lack the ruffled border that is indicative of active resorption. Alendronate does not interfere with osteoclast recruitment or attachment, but it does inhibit osteoclast activity. Studies in mice on the localization of radioactive [$^3$H]alendronate in bone showed about 10-fold higher uptake on osteoclast surfaces than on osteoblast surfaces. Bones examined 6 and 49 days after [$^3$H]alendronate administration in rats and mice, respectively, showed that normal bone was formed on top of the alendronate, which was incorporated inside the matrix. While incorporated in bone matrix, alendronate is not pharmacologically active. Thus, alendronate must be continuously administered to suppress osteoclasts on newly formed resorption surfaces. Histomorphometry in baboons and rats showed that alendronate treatment reduces bone turnover (i.e., the number of sites at which bone is remodeled). In addition, bone formation

c)      [Boniva]

The action of ibandronate on bone tissue is based on its affinity for hydroxyapatite, which is part of the mineral matrix of bone. Ibandronate inhibits osteoclast activity and reduces bone resorption and turnover. In postmenopausal women, it reduces the elevated rate of bone turnover, leading to, on average, a net gain in bone mass.

17

**B.**     <u>The 2008 Russell Study</u>

75.     Until October 2009, Actonel, at that time the only approved form of risedronate, was owned, sold and marketed by Proctor & Gamble ("P&G"). During the period of Proctor & Gamble's ownership, a study on Bisphosphonates (hereafter "the Russell Study" or "the Study") was published by one P&G employee and three other scientists who had each received funding from P&G in the form of research support and honoraria for lectures. <u>See</u> Russell RG, Watts NB, Ebetino E, Rogers MJ, <u>Mechanisms of Action of bisphosphonates: similarities and differences and their potential influence on clinical efficacy</u>, Osteoporosis Int. 19:733-759 (2008).

76.     The Russell Study does not report on any clinical data but, instead, theorizes about possible differences between the bisphosphonates with the goal of suggesting why further research might determine differences in clinical efficacy.

77.     Rather than reporting the results of any actual study or trial, the Russell Study looks at the data from other clinical studies, few, if any, of which directly compare the drugs in head-to-head clinical trials, and concludes that there *may* be differences among BPs in terms of their clinical effects, and that those differences *may* be explained by the differences in the BPs' chemical structures.

78.     The Russell Study starts from the proposition that the classic pharmacological effects of bisphosphonates ("BPs") are the result of two key properties: their affinity for bone, which causes them to bind to the bone's surface, and their inhibitory effect on FPPS and, thus, osteoclasts. The Russell Study examines the extent to which each drug has displayed these properties, as well as a third property, which the authors call "zeta potential." From there, the Study hypothesizes that the chemical and biochemical differences among BPs may lead to clinical differences.

79.     The Russell Study cites to earlier publications which concluded that, in terms of affinity for bone, the drugs at issue have the rank order of risedronate (Actonel and Atelvia),

18

ibandronate (Boniva), alendronate (Fosamax), with risedronate displaying the least affinity for bone and alendronate displaying the most.

80.     The Study authors also look at a factor that they call zeta potential which has been proposed to predict the total amount of BP that can bind to a particular area of bone surface. The more positively charged BPs, which include ibandronate and alendronate, are predicted to attract additional BPs to bind to the bone surface via their negatively charged phosphonate moieties, thus increasing the total amount of BP that binds in one area. On the other hand, the less positively charged BPs, including risedronate, would lead to a more negatively charged bone surface, which, the authors predict, may limit further accumulation of BPs.

81.     Third, the authors look at the BPs' inhibitory potency on FPPS. The authors point to several studies to show that risedronate, due to its chemical structure and the particular orientation of the molecule's nitrogen atom, has a higher biochemical potency than ibandronate or alendronate.

82.     The authors of the Russell Study acknowledge that making any comparisons between the BPs as to clinical efficacy is difficult because of the absence of head-to-head trials with fracture end points. "There are problems with comparing the clinical effects of bisphosphonates because of the lack of direct comparisons in head-to-head clinical trials with appropriate endpoints (e.g. fracture)." However, the Russell Study nonetheless compares the results of the individual trials, despite their differing methodologies and patient subgroups, to predict why the BPs could have different clinical outcomes.

83.     In general a higher affinity for bone and a higher potential to bind more BPs to a bone's surface is thought in the medical and scientific community to lead to increased clinical effectiveness. However, the Study's authors suggest that, in the case of risedronate, lower affinity may lead to greater distribution throughout the skeleton, allowing a broader impact and forming the basis for the nonvertebral indication.

84.     The Russell Study also proposes that the strong inhibitory action of risedronate leads to a faster speed of onset than the other BPs. There is no clinical data to support this

assertion or the assertion that risdronate may have the strongest inhibitory effect preventing bone turnover at a cellular level.

85.     The Russell study acknowledges that post approval studies have demonstrated that Alendronate (Fosamax) likely does reduce the risk of nonvertebral fractures and that Risedronate (Actonel) may likely reduce the risk of hip fractures.

86.     The Russell study is inconclusive as to whether any clinical distinctions can be made between the drugs based on its analysis of their mechanisms of action.  It asserts that each BP has a "unique profile" that might be clinically relevant and that there are likely differences between the BPs in terms of speed of onset of fracture reduction, efficacy at different skeletal sites, the regimen to be used, the degree and duration of suppression of bone turnover and how long to treat patients.

87.     At best, the Russell study is scientific conjecture about possible mechanism of action differences between the bisphosphonates.  It is not the kind of clinical study that the FDA would require before a manufacturer could make a claim of superiority or even non-inferiority.

## VI.     ALLEGATIONS

### A.     Warner Chilcott Used False Science to Promote Actonel and Atelvia as Superior to Competitors

88.     Relator began working for the Defendant in August of 2010.  He had prior experience in pharmaceutical sales at Pfizer and Pharmacia and anticipated that Warner Chilcott would take a similar view towards regulating the activities of their sales force in order to ensure compliance with FDA regulations.  However, from the beginning of his employment, Relator observed Defendant's disregard for the rules governing pharmaceutical sales and marketing.  On his first day, Relator's manager, Todd Schoenlein, told him that at Warner Chilcott, "only two things are black and white: samples and expense reports.  Everything else is shades of gray."

89.     Pursuant to its lack of regard for regulations, Warner Chilcott took the hypotheses from the Russell Study, exaggerated them, and taught them to its sales force as though they were fact.  Even presented in their most accurate form, the conclusions from the Russell Study are

20

theories at best. Indeed, even in the "Conclusion" section of the article, the authors refer to their proposed findings as "hypotheses" and acknowledge that "additional work will need to be done to confirm [them]." Likewise, Graham Russell, the lead author on the Study, recently gave a lecture in which he conceded that clinical studies would need to be performed to confirm their proposals about the cellular effects and the mineral binding properties of the competitor drugs.

90.     Notably, although Proctor & Gamble was involved in the funding and writing of the Russell Study, presumably for the purpose of product promotion, they recognized after the Study's publication that it drew no solid conclusions and had insufficient scientific grounding to justify using it to promote their products to physicians. Relator asked a former Proctor & Gamble sales representative about the study and was told that under P&G the Russell Study was not used to detail physicians.

91.     On the other hand, Defendant took versions of the Russell Study theories, exaggerated and skewed in favor of their products, and made them the core of their promotions for Atelvia and Actonel, in what they called the "Mechanism of Action" story. The "Mechanism of Action" story is the centerpiece of WC's sales training. Sales representatives are coached on it regularly and are expected to give it as part of their sales "consultations" with physicians. They receive performance reviews and considerations for incentive compensation based on their adherence to the "Mechanism of Action" story. The "Mechanism of Action" story is included in all sales training modules including the Actonel Learning System and the Atelvia Sales Training Module.

92.     Managers at Warner Chilcott developed the MOA story because they recognized that, despite the indication of Actonel and Atelvia for nonvertebral fractures, many physicians do not perceive significant differences between the bisphosphonates and are, thus, inclined to prescribe the lower-priced alendronate (Fosamax and the much less expensive generic Fosamax) for their patients than the expensive risedronate. Many physicians believe that risedronate's superior endpoints for nonvertebral fractures in their clinical trials resulted less from the drug's actual superiority, and more from the fact the risedronate studies were performed after the

21

clinical trials for Fosamax and that Proctor & Gamble was able to learn from the earlier studies and structure their trials to get the best results, including pooling data concerning the nonvertebral fractures from two separate arms of the VERT trial, to obtain the indication for nonvertebral fractures.

93.     As such, Defendant wanted a way to overcome objections from physicians that all of the BP drugs are essentially the same and to distinguish risedronate from the other BPs as "unique" among the BP drugs. Defendant relied on the Russell Study to develop a Mechanism of Action (MOA) story to convey to physicians that risedronate has superior efficacy for preventing fractures in postmenopausal osteoporosis.

94.     Put simply, the MOA story as presented to sales representatives is the following: "Actonel / Atelvia has a lower affinity for bone unlike Fosamax and Boniva that have medium to high affinity for bone. That means Actonel / Atelvia won't simply stick to the bone but will be able to penetrate vertebral and nonvertebral bone and sink deeper into trabecular bone. Penetrating into the bone allows Actonel / Atelvia to go deep into micro-fractures and heal bone. Additionally, Actonel / Atelvia's lower affinity for bone increases reentry into circulation leading to broader distribution throughout the skeleton than high-affinity drugs."

95.     Significantly, the Russell Study was published prior to Warner Chilcott's submission of a New Drug Application for Atelvia. Defendant apparently did not seek FDA approval for inclusion of the Russell study on the label so that it could state that the Study provided clinical evidence warranting a claim of superiority for risedronate over other bisphosphonates or even a claim that risedronate has a unique "Mechanism of Action."

96.     Defendant, moreover, does not even use accurate representations of the Russell Study's conclusions in its marketing. Instead, Defendant selects those theories that are favorable to marketing of Actonel and Atelvia, exaggerates them and promotes them as fact.

97.     For example, defendants train their sales force on the "two key properties" contributing to the pharmacological effects of bisphosphonates: (1) their ability to bind to bone or mineral (or "affinity"); and (2) their ability to bind and inhibit a key enzyme within the

22

osteoclast necessary for bone resorption (also called "potency"). Even focusing on these two properties alone is problematic as it ignores the "zeta potential" factor described in the Russell Study, which was not favorable to risedronate.

98.    The MOA story's version of the affinity factor is particularly skewed. Defendants "Learning System" for Actonel makes no mention of the general evidence suggesting that higher bone-binding affinity will increase efficacy. Instead, the training materials state that the "clinical significance is not known," but that the "differences in affinity are thought to affect the distribution of the bisphosphonates in the skeleton." The training materials go on to state that the strongest binding drugs "would be expected" to have less reentry into the circulation, a proposition not even suggested in the Russell Study.

99.    Similarly, Defendant's presentation of the potency factor promotes the theory that risedronate's molecular structure allows for tighter binding with and, thus, maximum inhibition of the FPPS enzyme as though it were proven truth. For example, the Actonel "Learning System" includes a computer-generated depiction of the way a risedronate molecule theoretically binds with the FPPS enzyme with the caption, "Below is a depiction of the risedronate molecule bound to the FPPS enzyme. You will notice the snug fit between the two." There is no scientific basis for the claim that the "fit" between the risedronate molecule and the FFPS enzyme impacts the level of FPPS inhibition or the drug's efficacy.

100.    In addition, the MOA story posits that while all of the nitrogen containing BPs inhibit osteoclasts through a stronger pathway than the non-nitrogen osteoclasts, it is only the "heterocyclic BPs such as risedronate that are thought to "induce a conformational change that locks the bisphophonate in the FPS enzyme with virtually irreversible binding." Relying exclusively on the Russell Study, the MOA story instructs that it is this mechanism that may allow risedronate "to better inhibit osteoclastic resorption" despite the lack of any clinical data to support this claim.

101.    From this explanation of the characteristics of the risedronate molecule, WC makes the further assertions in its Actonel Learning Module that "Actonel has unique structural

characteristics that contribute to th[e] product's mechanism of action" and "Actonel has important advantages." Throughout the Learning Module, WC repeats the same assertions that "No two bisphosphonates have the same combination of mineral affinity and enzyme inhibition potency. These differences may account for observed differences in clinical pharmacology and efficacy, although head-to-head clinical trials have not been conducted. Actonel has a high potency of the FPPS target enzyme and moderate mineral affinity."

102.    Defendant trains its sales force extensively on the MOA story, particularly in how it should be used to sell Atelvia to physicians. Relator was taught in the August 2010 training class about the "Mechanism of Action Conversation". The class was told by Warner Chilcott's president, W. Carlton Reichel that the FDA did not allow them to leave behind the Russell study. However, Relator also was explicitly told by trainers as well as Warner Chilcott's president that they must thoroughly understand the Russel Study and the Mechanism of Action Story and have the "Mechanism of Action Conversation" with every physician during their business conversations.

103.    The specific training session teaching the new sales representatives the MOA story was taught by Warner Chilcott's Vice President of Clinical Development, Jim Caminis. The importance of the MOA story was emphasized in a role playing exercise immediately following the Vice President's training in which the trainees practiced delivering the message to trainers, and a second role playing session the next day entitled, "Telling the Story with MOA." The trainees were ultimately assessed on their effective use of the MOA story in a session titled "Selling to the 'Splitter,'" in which the trainees practiced pitching the MOA story to a physician who believes that all bisphosphonates are the same, as well as training sessions "Selling to the Boniva Loyalist" and "Selling to the Generic Alendronate Loyalist."

104.    Even in the informal "Chat with the President," the President of Warner Chilcott, W. Carlton Reichel, emphasized the importance of the MOA story, instructing the sales representatives that, although they could not give copies the Russell Study to physicians, they

24

must have a full understanding of the MOA story and have the "Mechanism of Action Conversation" as part of a "business consultation" with every physician.

105.    In one training session, the sales representatives were encouraged to use sponges to visually demonstrate the MOA story to physicians. The demonstration consisted of pouring syrup on one sponge and pour water on a second. The sales representatives were instructed to tell physicians that the sponge in syrup was like Fosamax or Boniva on the bone – the mineral affinity was so high that it would adhere to the surface of the bone, but would not penetrate into the bone. Actonel and Atelvia, on the other hand, acted like the water, they would not just adhere to the outside of the bone, but would act on the inside as well. This presentation was intended to convey the superiority of Actonel and Atelvia, despite having no FDA approval and no basis in clinical research. Relator approached his manager, Ted Schoenlein, and explained that he believed that the demonstration was unscientific and outside of FDA guidelines, but his manager stated that Carl, the Warner Chilcott President, disagreed.

106.    Warner Chilcott's sales representatives were repeatedly instructed both during and after the August 2010 training to have the Mechanism of Action Conversation with every physician and thereby to claim superiority of Actonel and Atelvia over their competitors in the BP class.

107.    Relator objected to the false claims of superiority. In September and October of 2010 Relator again challenged the legality of the "Mechanism of Action Conversation," and expressed his belief that it was not consistent with the FDA-approved product insert. Relator's manager responded each time with a lengthy answer, concluding "Carl doesn't feel that way."

108.    In October of 2010 Relator's manager accompanied Relator on a physician visit. Following the visit, Relator's manager filled out a "Sales Representative Performance Evaluation & Coaching Report," on which, under the "Product Knowledge" heading, he wrote, "A product knowledge area that I did not observe, that also works well is the MOA story, differentiating the Bone Affinity and Enzyme Binding Affinity. Developing a deep understanding of the MOA story and effectively using that story as the reason there is a non-vert and speed difference will

25

help you transition into a quality Business Conversation. I'd encourage you to learn that story and use it in your sales calls."

109.   Again in January 2011, Relator raised concerns with his District Manager over the false claims of superiority made through the "MOA Conversation" and was told that "Carl feels differently" and that the "story makes sense" so he should use it in his business conversations with physicians.

110.   WC trained its sales representatives to claim superiority of Actonel and Atelvia over competitor products in the class through distorted interpretations of clinical data as well as through the MOA story. For example, the HIP study showed a reduction of hip fractures for risedronate in one arm by 60% relative to placebo but the FDA did not grant WC an indication for hip fracture reduction because the numbers in that phase of the trial were not statistically significant due to small sample size. By comparison, the FIT 1 & 2 (Fosamax pivotal trials) shows Fosamax hip fracture reduction at 50% and Fosamax was granted an indication by the FDA for hip fracture reduction. There is also data in the FIT 1 & 2 studies to support evidence that Fosamax protects against nonvertebral fractures but Fosamax does not have that approved indication.

111.   WC sales representatives are trained that when "hip fracture protection" questions arise with physicians, they should agree that Fosamax trials had a 50% reduction in fractures, but then point out that Risedronate had a 60% reduction in the HIP study (even though it does not have an approved indication for the same). WC sales representatives are thereby trained to equate the Fosamax PI indication for hip protection with the data for risedronate in the HIP study. Then, WC reps are instructed to mention that risedronate has an approved indication for protection against nonvertebral fractures and that Fosamax has no such indication without mentioning the data in support of nonvertebral fractures for Fosamax.

112.   In these ways, sales training for sales representatives is purposefully skewed toward false claims of superiority of Actonel and Atelvia over Fosamax (generic and brand) and Boniva. These claims are made even though there is some evidence from head-to-head studies

26

sponsored by Merck called FACT and FACT Extension that Fosamax (aldedondrate) may be more effective than risedronate in increasing Bone Mass Density (BMD), a significant factor in protecting against osteoporotic fractures.

113.   Moreover, WC trains its sales representatives to make numerous unfounded head to head comparisons with competitor drugs by comparing the incidence of fracture reduction in different subgroups within different studies without accounting for study design, population, dosage or administration or other confounding factors.

114.   For example, in one WC powerpoint entitled "Boniva overview," WC takes data from two very different clinical trials for Actonel and Boniva and trains its sales representatives that Boniva has a slower efficacy stating "Ibandronate did not reduce the risk of fractures in one year" and stating "How Actonel compares: Risedronate reduced the risk of vertebral fractures by 65% in 1 year." The same WC powerpoint presents Actonel as superior to Boniva in data supporting its nonvertebral fracture protection indication, rejecting secondary data from Boniva researchers of some reduction of nonvertebral fracture risk and stating "Actonel is the only oral bisphosphonate approved to reduce the risk of both vertebral and nonvertebral fractures."

115.   WC also trains its sales representatives with a partial and distorted view of the efficacy data available for competitor drugs. For example, in a WC powerpoint concerning Generic Alendronate or Fosamax, WC states that Fosamax's clinical data demonstrates that it does not significantly reduce nonvertebral fractures citing to one study. WC ignores other studies and retrospective analyses suggesting that Fosamax and its generic equivalent may have some efficacy for nonvertebral fractures. The WC powerpoint also states that the "hip fracture efficacy" for Fosamax was "barely significant" even though Fosamax is the only BP drug with a hip fracture indication.

116.   WC also trains its sales representatives that Actonel is superior to generic Fosamax because generics only require one study demonstrating bioequivalence to the branded drug and suggesting that the generic is of lesser quality because of "difference in size, shape and color: and because generic alendronate is manufactured by many different companies." WC

27

presents the superiority of Actonel and Atelvia as overriding concerns over cost and, through images of fractured bones, implies that patients taking generic Fosamax may save money on the medication but will ultimately lose any savings due to the cost of unnecessary fractures.

117.    Defendant's promotions were false and misleading and claimed superiority to competitor drugs without FDA approval for such claims or a sound scientific basis for such claims. Claims for superiority based on the MOA story or otherwise constitute misbranding. Once misbranded, these drugs cannot be delivered in interstate commerce, and are not eligible for reimbursement under federal or state health care plans.

118.    Defendant's promotions caused the submission of claims to federal and state health care programs for drugs that were misbranded and ineligible for reimbursement. Each of these submissions constitutes a false or fraudulent claim within the meaning of the Federal False Claims Act and the corresponding state statutes.

**B.      Warner Chilcott Falsely Claimed that Patients on Atelvia Demonstrated Higher Compliance and Adherence**

119.    Defendant further violated FDCA regulations by promoting the misleading message that patient compliance and adherence is higher with Atelvia than other bisphosphonates. For the purposes of this Complaint, compliance is defined as the extent to which a patient takes a drug as instructed and adherence is defined as a patient's persistence in taking a drug correctly over time.

120.    Atelvia differs from Actonel, Boniva and Fosamax in that it has an enteric coating, a barrier that prevents the medication's release before it reaches the intestine. However, Atelvia's product insert contains no suggestion that Atelvia has demonstrated higher rates of patient compliance or adherence, nor did any of the Clinical Trials submitted to the FDA provide any evidence of improved compliance or adherence, as compared with other bisphosphonates.

121.    Defendant's compliance and adherence claims are derived from the drugs' dosing requirements. Specifically, a patient taking Actonel, Fosamax or Boniva, must take the medication first thing in the morning and then wait 30-60 minutes before eating. Atelvia, on the

28

other hand, because of its enteric coating, is taken after eating. The dosing requirements themselves are accurate and contained on the drugs' product inserts. However, Defendant cannot validly assume that the differing dosing regimens will result in higher patient compliance and adherence with Atelvia.

122.   In fact, although the requirement that a patient wait 30 minutes before eating may be prohibitive for some, others may find it difficult to comply with Atelvia's restrictions that it *cannot* be taken on an empty stomach. Atelvia must be taken immediately after breakfast, after which, like the other bisphosphonates, the patient cannot lie down for 30 minutes. The product insert specifically states that, when administered before breakfast Atelvia resulted in a significantly higher incidence of abdominal pain as compared with immediate-release risedronate (Actonel).

123.   Allegations of improved patient compliance and adherence that are not supported by adequate evidence are misleading and the FDA takes them seriously. Even where a company's drug product has a dosing regimen that is more convenient, or other properties that would cause the pharmaceutical to be better tolerated, the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") has prohibited any promotions that suggest the drug improves patient convenience, unless there is substantial clinical evidence supporting the claim. See Warning Letter to Romark Laboratories, L.C., Department of Health and Human Services, DDMAC (May 25, 2009) (ordering the cessation of materials promoting superior compliance with the company's drug, taken twice a day, over competitor's drug, taken three times a day); Warning Letter to 3M Pharmaceuticals, Department of Health and Human Services, DDMAC (November 1, 1999) (requiring the company to remove the claim "convenient BID dosing for patient compliance" from promotional materials, where it was not supported by adequate evidence); and Warning Letter to BioMarin Pharmaceutical, Inc., Department of Health and Human Services, DDMAC, October 11, 2006 (requiring the company to cease promotions suggesting that the flavor enhancers in their product improve rates of compliance). As the DDMAC has noted, "[p]atient compliance may be influenced by a number of factors," including

29

economic variables, meaning that a patient may be less likely to continue to take a more expensive drug, like Atelvia. See Warning Letter to 3M Pharmaceuticals.

124.    Despite their lack of substantial evidence Warner Chilcott encouraged the sales force to use the improved patient compliance and adherence messages to promote Atelvia. When questioned about the data to support these claims, sales representatives are instructed to tell physicians that WC has the data "on file."

125.    Starting in January 2011, an email was sent from WC managers instructing representatives to perform a demonstration using vinegar on the enteric-coated Atelvia and on Actonel and competitor medications.  Representatives were instructed to put Fosamax, Boniva, Actonel and Atelvia tablets in cups of vinegar, in which Fosamax, Boniva and Actonel would begin to dissolve immediately, but the Atelvia tablet would remain whole. This was used to "demonstrate" to physicians how, unlike competitor bisphosphonates, Atelvia's enteric coating prevents the drug from breaking down in the stomach. Sales representatives were encouraged to use the visual to argue that Atelvia is better tolerated than the other bisphosphonates, thus increasing patient compliance. The demonstration is not scientific by any standards and uses sample medication outside of FDA guidelines.

126.    Furthermore, the sales representatives were instructed to encourage physicians to use the compliance and adherence messages to gain prior authorizations for Atelvia from insurance companies.  For example, Defendant provided the sales team with letters to offer physicians, that the physicians could then send to insurers, including Medicaid and Medicare, which contained messages such as, "[t]he availability of Atelvia will improve adherence to osteoporosis treatment and thereby reduce the incidence of osteoporotic fractures" and "Atelvia (risedronate sodium tablets) will help with compliance and absorption."

127.    Like the MOA story, Defendant's compliance and adherence promotions were false and misleading, rendering the drugs misbranded.  Each submission to a federal or state

30

health plan for reimbursement for a misbranded product constitutes a false claim within the meaning of the federal False Claims Act and the corresponding state statues.

**C. Warner Chilcott Uses Financial Inducements To Influence Physicians' Prescribing Practices**

128.   Warner Chilcott also uses kickback schemes, including numerous expensive physician dinners, speaker payments and billing assistance to induce physicians to increase the number of prescriptions written for Defendant's products.

129.   Warner Chilcott utilizes frequent dinners to disseminate its promotional messages for Atelvia and Actonel.  Sales representatives are expected to hold two at least "Med Ed's," dinners with physicians held at fine local restaurants, per week. Warner Chilcott spends millions on these physician Med Eds.  Certain sales representatives spend over $10,000 per month on the Warner Chilcott Med Eds and Relator's sales region totals over $300,000 monthly on Med Ed expenditures.  When Relator asked his managers why the Med Ed's were so important, he was told that restaurants, not offices, are a better venue for "business conversations."  Sales reps are instructed to use the dinners to get commitments from doctors that they will write a certain number of Atelvia scripts over a set period of time.

130.   Additionally, Warner Chilcott trains and pays a high number of "advocate speakers" to participate in the Med Ed's.  Each sales representative is expected to have at least ten speakers in his or her territory. Overall, WC has more than 2000 trained speakers across the country.  Warner Chilcott management believes that these advocate speakers are a "huge business opportunity."  Every speaker is expected to give Atelvia at least a 25 percent market share of their prescriptions for osteoporosis medications, and the "speaker" positions are offered to physicians in order to induce them to increase the number of prescriptions written for Atelvia. Thus, Relator's District Manager, Todd Schoenlein, wrote in an email, "If on average our Advocates are at 25% or more market share your territory business and our direct business would be significantly increased."

31

131.    The speakers are paid approximately $125 to $150 for their speaker training and between approximately $400 and $900 for each Med Ed they attend ($400 to $500 for primary care physicians; $800 to $900 for specialists, such as rheumatologists).  At the Med Eds, promotionally called "Speaker Led Roundtable Discussions," the advocate speakers are, as the name implies, expected to promote Atelvia and Actonel to their fellow physicians.

132.    Warner Chilcott maintains over 1,700 trained speakers, many of whom are rarely, if ever utilized.  Thus, Defendant pays physicians to be trained as "speakers," (i.e. paid physicians to listen to the promotional messages for Actonel and Atelvia) even though the company knows that additional trained speakers are not needed and will not be used.  These training payments are disguised kickbacks, offered to reward high-prescribers of Defendant's products, and to induce others to increase prescriptions.

133.    WC sales representatives are trained to provide other valuable in-office services for prescribing physicians as well.  For example, in January of 2011, at Warner Chilcott's national launch meeting for Atelvia held in Orlando, Florida, WC sales reps were instructed to "help offices fill out prior authorization forms" to facilitate the acceptance of the newly approved drug.  Relator spoke with his manager challenging the legality of having Warner Chilcott representative fill out prior authorization forms, but was told that "management said it was fine."

134.    Furthermore, sales representatives were encouraged to promote their aid to doctors in gaining prior authorizations, even for off-label uses.  For example, an email that Relator's District Manager forwarded to him and the other sales representatives shortly after the Atelvia Launch Meeting listed ICD9 diagnosis codes that representatives "might need it [sic] for a PA or to help your billing staff," including off-label diagnoses.  Although Atelvia is only indicated for postmenopausal osteoporosis, the email encouraged reps to use the ICD9 codes for osteoporosis due to immobilization or inactivity (733.03), as well as drug induced osteoporosis (733.09).

135.   In February of 2011, Relator's District Manager forwarded an email from Gilbert Gonzales, District Manager in Texas, with an attached "Prior Authorization Toolbox." The Toolbox contains the forms required by various insurers, including Medicare Part D, to obtain approval for a drug. It also contains several letters written with the specific verbiage that Warner Chilcott believed would persuade insurers to approve payment for the Atelvia. The letters are designed to be modified with physician and patient information, and then copied and pasted onto clinic letterhead and sent to the insurers along with the prior authorization form.

136.   The letters included in the Prior Authorization Toolbox each provided different reasons why a patient may respond better to Atelvia than another medication. For example, one letter says that the patient needs to be able to eat first thing in the morning with her medications; another says that the patient has already tried all the medications. However, management's instructions make clear that the letter chosen for use should not necessarily reflect the individual patient's needs, rather it should be "chosen based on the response from the managed care company and/or pharmacy."

137.   The Prior Authorization Toolbox is also used to promote off-label and misleading messages. As described above, prior authorization letters contain Defendant's misleading promotional messages regarding increased patient compliance and adherence with Atelvia. In addition, the Toolbox includes a letter to be given to doctors that encouraged insurers to approve Atelvia for use in "men with low bone mass." Because Atelvia's indication is limited to postmenopausal osteoporosis, any use in men is off-label. Thus, Defendant's promotion to physicians and encouragement to seek reimbursement for Atelvia use in this patient population is illegal.

138.   Representatives are instructed to carry folders with all the forms and letters from the Prior Authorization Toolbox, as well as a flash drive containing the materials ("in case the office wants an electronic copy") during every call with a doctor or staff.

33

139.   After receiving the email regarding the Prior Authorization Toolbox, Relator again spoke with his manager and questioned the legality of filling out prior authorization forms for physicians as well as use of the Toolbox, but Relator was again told that management said that the practices were fine. However, in March of 2011, sales representatives were told that they were to stop filling out physician's prior authorizations.

140.   The expensive meals provided to physicians, the payments to advocacy speakers, and the assistance that the sales representatives provide filling out the prior authorization forms and letters all constitute things of value. Additionally, upon information and belief, at least one purpose of the provision of each of these items and services was to induce or reward physicians for prescribing, referring or recommending Defendant's products. Thus, each payment, or provision of a meal or a service, constituted a reward or kickback in violation of the Anti-Kickback Statute. Claims submitted to federal health programs for prescriptions induced through kickbacks are false or fraudulent claims and not eligible for reimbursement.

### Count I
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)-(B) and (G)

141.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

142.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

143.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

144.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to induce the Government to approve and pay such false or fraudulent claims.

145.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements material to obligation to pay or transmit money or property to the Government, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

146.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by numerous separate entities, across the United States. Relator has no control over or dealings with such entities and has no access to the records in their possession.

147.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

148.   By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

149.   Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count II**
**California False Claims Act**
**Cal Gov't. Code § 12651(a)(1), (2) and (7)**

150.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 149 above as though fully set forth herein.

151.   This is a claim for treble damages and penalties under the California False Claims Act.

152.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

35

153.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

154.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements material to its obligation to pay or transmit money or property to the California State Government, and knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money to the California State Government.

155.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

156.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

157.   By reason of Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

158.   Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count III
### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b(a)(1), (2) and (7)

159.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

160.   This is a claim for treble damages and penalties under the Connecticut False Claims Act.

161. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval under medical assistance programs administered by the Department of Social Service.

162. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

163. By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Connecticut State Government.

164. Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relators have no control over or dealings with such entities and have no access to records in their possession.

165. The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

166. By reason of Defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

167. Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count IV
## Delaware False Claims and Reporting Act
### 6 Del C. § 1201(a)(1), (2) and (7)

168. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

37

169.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

170.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

171.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

172.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Delaware State Government.

173.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

174.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

175.    By reason of Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

176.    The State of Delaware is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count V**
**Florida False Claims Act**
**Fla. Stat. Ann. § 68.082(2)(a), (b) and (g)**

177.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

38

178. This is a claim for treble damages and penalties under the Florida False Claims Act.

179. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

180. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

181. By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Florida State Government.

182. Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

183. The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

184. By reason of Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

185. Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count VI**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.1(a)(1), (2) and (7)**

186. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

39

187.   This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

188.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

189.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

190.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Georgia State Government.

191.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

192.   The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

193.   By reason of Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

194.   Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count VII
### Hawaii False Claims Act
### Haw. Rev. Stat. § 661-21(a)(1), (2), and (7)

195.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

40

196.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

197.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

198.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

199.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Hawaii State Government.

200.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

201.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

202.    By reason of Defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

203.    Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count VIII**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. § 175/3(a)(1), (2) and (7)**

204.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

205.   This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

206.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

207.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

208.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Illinois State Government.

209.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

210.   The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct..

211.   By reason of Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

212.   Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count IX
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code Ann. § 5-11-5.5-2(b)(1)-(2), (6)

213.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

42

214.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

215.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

216.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

217.     By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Indiana State Government.

218.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

219.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

220.     By reason of Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

221.     Additionally, the Indiana State Government is entitled to the maximum penalty of for each and every violation alleged herein.

### Count X
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 437 et seq.

222.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

43

223.   This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

224.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

225.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

226.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Louisiana State Government.

227.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

228.   The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

229.   By reason of Defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

230.   Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XI
### Maryland False Health Claims Act
### Md. HEALTH-GENERAL Code Ann. § 2-602(a)(1), (2), (7) and (8)

231.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

44

232.   This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

233.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

234.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

235.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Maryland State Government.

236.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

237.   The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

238.   By reason of Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

239.   Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 § 5B(1), (2) and (8)

240.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

45

241.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

242.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

243.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

244.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Massachusetts State Government.

245.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

246.   The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

247.   By reason of Defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

248.   Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XII**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws. § 400.601 et seq.**

46

249.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

250.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

251.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

252.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

253.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Michigan State Government.

254.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

255.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

256.    By reason of Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

257.    Additionally, the Michigan State Government is entitled to the maximum civil penalties for each and every violation alleged herein.

**Count XIII**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.02(a)(1), (2) and (7)**

47

258.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

259.   This is a claim for treble damages and penalties under the Minnesota False Claims Act.

260.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

261.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Missouri State Government to approve and pay such false and fraudulent claims.

262.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Minnesota State Government.

263.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

264.   The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

265.   By reason of Defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

266.   Additionally, the Minnesota State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XIV
### Montana False Claims Act

48

## Mont. Code Ann. § 17-8-403(1)(a), (b) and (g)

267.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

268.   This is a claim for treble damages and penalties under the Montana False Claims Act.

269.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

270.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

271.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Montana State Government.

272.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

273.   The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay claims that would not be paid but for Defendant's illegal marketing practices and inducements.

274.   By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

275.   Additionally, the State of Montana is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

49

**Count XV**
**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. § 357.040(1)(a), (b) and (g)**

276.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

277.     This is a claim for treble damages and penalties under the Nevada False Claims Act.

278.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

279.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

280.     By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Nevada State Government.

281.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

282.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

283.     By reason of Defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

284.     Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

50

**Count XVI**
**New Hampshire False Claims Act**
**N.H. Rev. Stat. Ann. § 167:61-b(I)(a), (b) and (e)**

285. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

286. This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

287. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

288. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

289. By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Hampshire State Government.

290. Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

291. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

292. By reason of Defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

293. Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

51

**Count XVII**
**New Jersey False Claims Act**
**N.J. Stat. §§ 2A:32C-3(a), (b) and (g)**

294. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

295. This is a claim for treble damages and penalties under the New Jersey False Claims for Medical Assistance Act.

296. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

297. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

298. By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Jersey State Government.

299. Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

300. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

301. By reason of Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

302.   Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XVIII
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-4(A), (B) and (E)

303.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

304.   This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

305.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

306.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

307.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Mexico State Government.

308.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

309.   The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

53

310.    By reason of Defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

311.    Additionally, the New Mexico State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

### Count XIX
### New York False Claims Act
### N.Y. State Fin. § 189(1)(a), (b) and (g)

312.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

313.    This is a claim for treble damages and penalties under the New York False Claims Act.

314.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

315.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

316.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New York State Government.

317.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

318.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

319.    By reason of Defendant's acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

320.    Additionally, the New York State Government is entitled the maximum civil penalty of $12,000 for each and every violation alleged herein.

**Count XX**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-607(a)(1), (2) or (7)**

321.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

322.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

323.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

324.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

325.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements material to obligation to pay or transmit money or property to the North Carolina State Government, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the North Carolina State Government.

326.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

327.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

328.    By reason of Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

329.    Additionally, the North Carolina State Government is entitled the maximum civil penalty of $11,000 for each and every violation alleged herein.

**Count XXI**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63 § 5053.1(B)(1), (2) and (7)**

330.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

331.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

332.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

333.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

334.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Oklahoma State Government.

335.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of

separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

336.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

337.    By reason of Defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

338.    Additionally, the Oklahoma State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

**Count XXII**
**Rhode Island False Claims Act**
**R.I. Gen. Laws § 9-1.1-3(A)(1), (2) and (7)**

339.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

340.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

341.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

342.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

343.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Rhode Island State Government.

344.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. The false or fraudulent claims were presented by thousands of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

345.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

346.    By reason of Defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

347.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XXIII
### Tennessee False Claims Act and Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(1), (2), (7) and 71-5-182(a)(1)(A), (B) and (D)

348.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

349.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

350.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

351.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

352.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Tennessee State Government.

353.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

354.   The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

355.   By reason of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

356.   Additionally, the Tennessee State Government is entitled to the maximum penalty allowed by Tennessee law for each and every violation alleged herein.

### Count XXIV
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. § 36.002

357.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

358.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

359.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

360.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

361.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Texas State Government.

362.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

363.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

364.    By reason of Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

365.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XXV
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.3(a)(1), (2) and (7)

366.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

367.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

368.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

60

369.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

370.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Virginia State Government.

371.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

372.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

373.    By reason of Defendant's acts, the State of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

374.    Additionally, the Virginia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XXVI
### Wisconsin False Claims for Medical Assistance Act
### Wis. Stat § 20.931(2)(a), (b) and (g)

375.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

376.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

377.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

378.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

379.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Wisconsin State Government.

380.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

381.   The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

382.   By reason of Defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

383.   Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XXVII
### District of Columbia Procurement Reform Amendment Act
### D.C. Code Ann. § 2-308.14(a)(1), (2) and (7)

384.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as though fully set forth herein.

385.   This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

62

386.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

387.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

388.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the District of Columbia Government.

389.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct.  The false or fraudulent claims were presented by thousands of separate entities across the District of Columbia.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

390.   The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

391.   By reason of Defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

392.   Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## VII.   <u>PRAYER</u>

WHEREFORE, Mr. Wible prays for judgment against the Defendant as follows:

1.   That Defendant cease and desist from violating 31 U.S.C. § 3729 <u>et seq.</u>, and the equivalent portions of the state statutes set forth above;

63

2.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of California has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Cal. Gov't. Code § 12651(a);

4.     That this Court enter judgment against Defendant in an amount equal to three times the damages the State of Connecticut has sustained because of Defendant's actions, plus a civil penalty of $ 10,000 for each violation of Conn. Gen. Stat. § 17b-301b(a);

5.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. § 1201(a);

6.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. § 68.082(2);

7.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. § 49-4-168.1;

8.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. § 661-21(a);

9.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. § 175/3(a);

10.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendant's actions, plus a civil penalty of at least $5,000 for each violation of Ind. Code Ann. § 5-11-5.5-2(b);

11.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. § 437 et seq.;

12.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages that the State of Maryland has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Md. HEALTH-GENERAL Code Ann. § 2-602(a).

13.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 § 5B;

14.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendant's actions, plus civil penalties for each violation of Mich. Comp. Laws. § 400.601 et seq.;

15.     That this Court enter judgment against Defendant in an amount equal to three times the damage the State of Minnesota has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of Minn. Stat. § 15C.02(a);

16.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendant's actions, plus civil penalties for each violation of Mont. Code. Ann. § 17-8-403(1);

17.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. § 357.040(1);

18.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of N.H. Rev. Stat. Ann. § 167.61-b(I).

19.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of N.J. Stat. § 2A:32C-3;

20.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendant's actions, plus civil penalties of $10,000 for each violation of N.M. Stat. Ann. § 27-2F-4;

21.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New York has sustained because of Defendant's actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. § 189(1);

22.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of N.C. Gen. Stat. § 1-607(a);

23.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63 § 5053.1(B);

24.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of R.I. Gen. Laws § 9-1.1-3(a).

25.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendant's actions, plus the maximum allowable civil penalty for each violation of Tenn. Code Ann. § 4-18-103(a) and § 71-5-182(a)(1);

26.   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendant's actions, plus the maximum allowable civil penalty for each violation of Tex. Hum. Res. Code Ann.   § 36.002;

27.   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Virginia has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. § 8.01-216.3(a);

28.   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of Wis. Stat § 20.931(2);

29.   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. § 2-308.14(a);

30.   That Mr. Wible be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

31.   That Mr. Wible be awarded all costs of this action, including attorneys' fees and expenses; and

32.   That Mr. Wible recover such other relief as the Court deems just and proper.

## VIII.  **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Wible hereby demands a trial by jury.

Dated:  June __, 2011

Respectfully Submitted,

CHRISTOPHER WIBLE,

By His Attorneys,

By:  __/s/ Colette Matzzie_____
Colette G.. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@philipsandcohen.com

By: /s/ David H. Rich_____
Christopher Weld (BBO # 522230)
David H. Rich (BBO # 634275)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626
drich@toddweld.com

68

## VIII.   **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Wible hereby demands a trial by jury.

Dated:  June 27, 2011

Respectfully Submitted,

CHRISTOPHER WIBLE,

By His Attorneys,

By:   _/s/ Colette Matzzie_
Colette G.. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@philipsandcohen.com

By: _/s/ David H. Rich_
Christopher Weld (BBO # 522230)
David H. Rich (BBO # 634275)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626
drich@toddweld.com