UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE STATES OF CALIFORNIA and ILLINOIS, <u>ex rel</u>. CHRIS WIBLE, <br><br> Plaintiffs, <br><br> vs. <br><br> WARNER CHILCOTT PLC, WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US), LLC, WARNER CHILCOTT FINANCE LLC, and WARNER CHILCOTT COMPANY, LLC, <br><br> Defendants. | Case No.  11-11143-NMG <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **LEAVE TO FILE GRANTED ON APRIL 1, 2014** |

Plaintiff-Relator Chris Wible, through his attorneys Phillips & Cohen LLP and Todd & Weld LLP, on behalf of himself and the States of California and Illinois (collectively "the States"), for his Complaint against defendants Warner Chilcott PLC, Warner Chilcott Corporation, Warner Chilcott (US), LLC, Warner Chilcott Finance LLC, and Warner Chilcott Company, LLC (collectively "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

I.      **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of private insurers in California and Illinois arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871, <u>et seq.</u> ("CIFPA"), and the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92 <u>et seq.</u> ("IICFPA").

2.      This action also seeks to recover damages related to the unlawful termination of Relator's employment because of his lawful acts to stop Defendants' violations of the federal False Claims Act, 31 U.S.C. §§ 3279 <u>et seq.</u> ("the FCA").

3.      As detailed below, Defendants have illegally promoted the osteoporosis medications Actonel and Atelvia with false claims of superiority to competitor drugs (generic Fosamax and Boniva).  Despite the lack of any head-to-head trials, or any other substantial clinical evidence, the company promotes the drugs as having a superior "mechanism of action" to the other drugs in the class.  Defendants have also illegally promoted Atelvia as improving patient compliance, despite the lack of substantial clinical evidence.

4.      Furthermore, Defendants have used kickback schemes, including numerous expensive physician dinners, speaker payments and billing assistance to induce physicians to increase the number of prescriptions written for Defendants' products.

5.      Defendants have also assisted physicians in preparing falsified prior authorization forms and other documentation submitted to insurers in order to persuade insurers to approve coverage for Defendants' products.

6.      Private insurers in California and Illinois have spent tens of millions of dollars in the reimbursement of Defendants' products.  Private insurers reimbursed upwards of $1 billion for Actonel in 2010.  Approximately 11% of private insurance claims for Warner Chilcott drugs were submitted to insurers doing business in California and approximately 4% to insurers doing business in Illinois.

7.      Actonel and Atelvia are more expensive than competitor drugs, particularly Fosamax, for which there has been a generic since February of 2008.  For example, in 2010, Medicaid reimbursed an estimated $3.56/unit of 5 mg Actonel, the daily dosage.  In the same year, Medicaid reimbursed approximately $1.03/unit of 10 mg Fosamax (branded), also the daily dosage, and $0.54/unit of 10 mg generic Fosamax.  Private insurers reimbursement rates are similarly significantly lower for branded and generic Fosamax than Actonel or Atelvia.

8.      The CIFPA and IICFPA provide that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to a private insurer in California or Illinois, respectively, for payment or approval is liable for a civil penalty of up to $10,000 for each such

claim, plus three times the amount of the damages sustained by the Government.  Cal. Ins. Code §1871.7(b) and 740 Ill. Comp. Stat. § 92/5(b).

9.      The CIFPA and IICFPA allow any person having information about a false or fraudulent claim against a private health insurer to bring an action for himself and the State, and to share in any recovery.

10.     Based on the foregoing laws, qui tam plaintiff Chris Wible seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendants knowingly made or caused to be made in connection with their fraudulent scheme.

## II.     PARTIES

11.     Plaintiff/Relator Chris Wible ("Relator") is a resident of Eugene, Oregon.  Mr. Wible was a sales representative in Warner Chilcott's Southwest Region in the Primary Care Division from 2010-2011.  At Warner Chilcott, Mr. Wible was involved in the sales promotion of Atelvia and Actonel, as well as other drugs.

12.     Throughout his tenure at Warner Chilcott as a sales representative, Mr. Wible objected to his manager to participating in the fraudulent misbranding scheme described herein. Mr. Wible also objected to his manager to participating in the illegal inducement scheme described herein.  Mr. Wible further objected to Warner Chilcott's fraudulent scheme involving sales representatives participating in the completion of falsified prior authorization forms, as described herein.

13.     As a consequence for objecting to, and refusing to participate in, Warner Chilcott's fraudulent marketing schemes, Warner Chilcott abruptly terminated Mr. Wible's employment in the Fall of 2011.

14.     Prior to joining Warner Chilcott, Mr. Wible had worked as a pharmaceutical sales representative for Pharmacia beginning in February of 2000, and later Pfizer, following the

company's purchase of Pharmacia in 2003.  Mr. Wible has also worked in sales at General Mills and Phillip Morris.

15.     Mr. Wible is an "interested person" within the meanings of the CIFPA and IIFCPA as a former employee of Warner Chilcott who was terminated in response to his objections to Warner Chilcott's fraudulent promotional activities.  Mr. Wible, through his attorneys, served copies of his First Amended Complaint and written disclosure of the material evidence and information in Mr. Wible's possession concerning Defendants violations of the CIFPA and IICFPA on the District Attorney and Insurance Commissioner in California, pursuant to Cal. Ins. Code § 1871.7(e)(2), and the Illinois State's Attorney and Attorney General, pursuant to 740 Ill. Comp. Stat. § 92/15(b).

16.     The governmental plaintiffs in this lawsuit are the States of California and Illinois.

17.     Defendant Warner Chilcott PLC is a global pharmaceutical company incorporated in Ireland and headquartered at 1 Grand Canal Square, Docklands, Dublin, NJ 2, Ireland. Through its subsidiaries, Warner Chilcott PLC employs approximately 1,200 sales representatives and markets its products throughout the United States. On October 30, 2009, Warner Chilcott PLC acquired Proctor & Gamble's global branded prescription pharmaceutical business for $3.2 billion.  In 2010, the net sales of Warner Chilcott PLC's subsidiaries totaled over $2.8 billion.

18.     Defendant Warner Chilcott Corporation is a wholly-owned subsidiary of Warner Chilcott PLC.  Warner Chilcott Corporation is a holding company organized, existing, and doing business under the laws of the State of Delaware, with its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

19.     Defendant Warner Chilcott (US), LLC is an indirect wholly-owned subsidiary of Warner Chilcott PLC.  Warner Chilcott (US), LLC is organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

20.     Defendant Warner Chilcott Finance LLC is an indirect wholly-owned subsidiary of Warner Chilcott PLC.  Warner Chilcott Finance LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

21.     Defendant Warner Chilcott Company, LLC is an indirect wholly-owned subsidiary of Warner Chilcott PLC.  Warner Chilcott Company, LLC is a limited liability company organized and existing under the laws of Puerto Rico, with its principal place of business at Union Street, Road 195, Km 1.1, Fajardo, Puerto Rico 00738-1005.

22.     The foregoing defendants are collectively referred to herein as "Warner Chilcott," "WC," or "Defendants."

## III.   **JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

24.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found to have transacted business in the District of Massachusetts.

25.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district, maintained employees and offices in this district, and/or made significant sales within this district.

## IV.     APPLICABLE LAW

### A.     The California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act

26.     The California Insurance Frauds Prevention Act ("CIFPA"), Cal. Insurance Code. 1871.7 creates civil liability for any violation of California Penal Code § 550 which makes it unlawful to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or allow it to be presented, in support of any false or fraudulent claim" or to "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit." Cal. Pen. Code § 550(a)(5) and (6).  It is additionally unlawful to aid, abet solicit, or conspire with any person to do either of the above.  Id.

27.     In addition, the CIFPA makes it unlawful to "employ runners, cappers, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract or insurance or that will be the basis for a claim against an insured individual or his or her insurer," Cal. Ins. Code § 1871.7(a), and creates civil liability for any person who violates that provision.  Cal. Ins. Code § 1871.1(b).

28.     Under the CIFPA, every person who violates California Penal Code §550 is subject to civil penalties between $5,000 and $10,000 plus an assessment of not more than three times the amount of each claim for compensation submitted pursuant to the contract of insurance.  Cal. Ins. Code 1871.7(b).  This penalty is assessed for "[e]ach fraudulent claim presented to an insurance company by a defendant."  Id.

29.     CIFPA may be enforced by a private person, *i.e.*, a qui tam plaintiff.  Cal. Insurance Code 1871.7(e).

30.     The purpose of CIFPA is to protect and compensate California for the harm to the State caused by insurance fraud and to assist the State to "more effectively investigate and discover insurance frauds, and [halt] fraudulent activities." Cal. Insurance Code. 1871(a).

31.     The Illinois Insurance Claims Fraud Prevention Act is also aimed at prosecuting fraudulent insurance claims filed against private insurance companies or self-insured entities. 740 ILCS 92/1 et seq.

32.     Under the IICFPA, a claim may be brought against a defendant for "knowingly making or causing to be made a false claim on an insurance policy" or "knowingly offering or paying remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance" except as permitted by law.  740 ILCS 92/5(a).

33.     Civil penalties include $5000 to $10,000 per false claim submitted under an insurance contract, plus three times the amount of each false claim; equitable relief to prevent to dissipation of illegal proceeds or to protect the public; and payment of attorneys' fees and costs.

34.     Under the IICFPA, any interested person may bring a civil action for violation of IICFPA.

35.     Kickbacks offered to induce claims for Actonel and Atelvia to be submitted to private insurers constitute the employment of persons "to procure clients or patients to perform or obtain services or benefits under a contract or insurance," in violation of the CIFPA.

36.     Kickbacks offered to induce claims for Actonel and Atelvia to be submitted to private insurers constitute the knowing offer or payment of "remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance," in violation of the IICFPA.

37.     Claims submitted to private insurers for Actonel and Ateival which were induced by false and misleading statements made to physicians claiming superiority of Actonel and Atelvia over competitor branded and generic osteoporosis medications are fraudulent submissions of claims in violation of the CIFPA and the IICFPA.

38.     Prior authorization forms and other forms and letters seeking medication coverage from private insurers which contain false information about particular patients or false or

fraudulent information about the medication for which reimbursement is sought constitute false or fraudulent claims in violation of the CIFPA and IICFPA.

### B.   The FDA Regulatory Scheme

39.     Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses and approves the labeling (hereafter, "product insert") to be disseminated with the drug.  Id. § 355(a) and (d).  The FDA's approval of a drug is the final stage of a multi-year process of study and testing.

40.     The drug's product insert must contain specific information about the drug, including its approved indication(s) and its mechanism of action, that is, the specific biochemical interaction through which a drug produces its pharmacological effect.  21 C.F.R. § 201.57(c)(2) and (c)(13)(ii)(A).  The FDA will only approve a new drug application if the product insert contains accurate information supported by substantial clinical evidence.

41.     Any statements comparing the safety or effectiveness of a drug with other agents for the same indication will generally be included in the indication section of the product insert, and must be supported by substantial evidence derived from adequate and well-controlled studies.  Id. § 210.57(c)(2)(iii).

42.     The FDCA prohibits the "alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, *or the doing of any other act with respect to*, a food, drug, device, or cosmetic, if such act is done while the article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."  Id. § 331(k) (emphasis added).

43.     The FDCA prohibits the introduction of misbranded pharmaceutical products into interstate commerce.  21 U.S.C. § 331(a).  Likewise, misbranded products may not be sold after interstate shipment of the product.  Id. § 331(c).

44.     A drug is misbranded if its labeling is "false or misleading in any particular." Id. § 352(a).  Thus, a drug is misbranded if the labeling represents or suggests that a drug is safer or more effective than another drug, when this has not been demonstrated by substantial evidence or substantial clinical experience.  21 C.F.R. § 201.6(a) ("Among representations in the labeling of a drug which render such drug misbranded is a false or misleading representation with respect to another drug or a device or a food or cosmetic.")

45.     The drug's labeling includes, but is not limited to, the product insert in the drug's package.  The FDCA defines labeling to include "all labels and other written, printed, or graphic matter…accompanying a drug."  Id. § 321(m).  Regulations further explain that labeling includes, "[b]rochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug…published for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug…" 21 C.F.R. § 202.1(l)(2).

46.     Federal regulations also limit the form and content of the information a manufacturer may disseminate to physicians through advertisements.  FDA regulations specifically prohibit advertising that:

> [c]ontains a drug comparison that represents or suggests that a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience.

21 C.F.R. § 202.1(e)(6)(ii).

47.     The FDA interprets the term "advertisement" broadly, to include not only written information promoting the product, but any "information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product." 62 Fed. Reg. 64,074, 64,076 (1997).  Thus, advertisements include oral statements made by manufacturers' sales and marketing agents.  On a number of occasions, DDMAC has prohibited

manufacturers from making unsubstantiated claims of superiority.  As with labeling, prescription drug advertisements that are false or misleading cause the drug to be misbranded.

## V.    BACKGROUND

### A.    Osteoporosis and Bisphosphonates

48.    Bone is a living tissue that changes throughout one's life through two processes: bone modeling and bone remodeling.  During childhood and adolescence, bones grow and shift in size by bone modeling, through which new bone is formed at one site while old bone is removed from another site within the same bone.  Once the body reaches adulthood, the bone changes through bone remodeling, in which mature bone tissue is replaced with new bone tissue.

49.    The cells responsible for bone remodeling include osteoblasts, which secrete new bone, osteoclasts, which break bone down, and osteocytes, which detect and signal damage.  In adults, a balance between bone resorption by osteoclasts and bone formation by osteoblasts maintains bone mass and skeletal integrity.

50.    Osteoporosis is characterized by the thinning of bone tissue and loss of bone mineral density over time.  The disease leads to increased bone fragility, and consequent increase in the risk of fracture.  Osteoporosis develops where there is a prolonged imbalance in bone remodeling, where bone resorption exceeds bone formation, such that spaces within the bone become enlarged, decreasing bone strength.

51.    There are two types of osteoporosis: primary and secondary.  More than 95% of osteoporosis is primary osteoporosis, which can be classified as: (1) type I or postmenopausal osteoporosis, resulting from the sharp decreases in bone mass as estrogen declines around and during the menopausal period; or (2) type II or age related osteoporosis, caused by the slow decline in bone mass over time, which begins around age 30 to 45.  Secondary osteoporosis refers to cases in which specific disease or other conditions cause loss of bone mass.

52.    Osteoporosis is diagnosed by measuring bone mineral density ("BMD"), which is the amount of bone mass per unit volume.  Osteoporosis is defined as having a BMD value ≤2.5

standard deviations below that of a normal young adult 30 years of age of the same gender and ethnic background.

53.     Fractures resulting from osteoporosis are generally classified as either vertebral (i.e., involving the spine) or nonvertebral.  Vertebral fractures are the most common single site of osteoporosis accounting for 27% of all fractures.

54.     There are two basic types of drug therapy for osteoporosis.  Antiresorptive drugs reduce bone loss by decreasing the activity of osteoclasts, while anabolic drugs build bone by stimulating osteoblasts preferentially over osteoclasts.

55.     The antiresorptive drugs include bisphosphonates, estrogens, and selective estrogen receptor modulators.  The drugs at issue in this complaint are bisphosphonates.

56.     The chemical structure of bisphosphonates, all of which contain two phosphate groups linked by a central carbon atom, allows them to bind to the surface of bone where they are taken up by osteoclasts.  Once inside the osteoclasts, the bisphosphonates inhibit a key enzyme, farnesyl pyrophosphate synthase (FPPS).  When FPPS is inhibited, osteoclasts become less active and eventually undergo cell death.  As a result, bone resorption and turnover are reduced.

57.     The bisphosphonates at issue in this complaint include Warner Chilcott's Actonel and Atelvia (both risedronate) as well as their competitors, Fosamax (alendronate) and Boniva (ibandronate).  As detailed below, the Bisphosphonates' approved indications are varied.  For the purposes of this complaint, the significant differences are pursuant to the drugs' indications for postmenopausal osteoporosis.

58.     Fosamax, manufactured by Merck, was approved by FDA in 1995 for, among other things, "Treatment and prevention of osteoporosis in postmenopausal women" with the following indications:

- For the treatment of osteoporosis, FOSAMAX increases bone mass and reduces the incidence of fractures, including those of the hip and spine (vertebral compression

fractures). Osteoporosis may be confirmed by the finding of low bone mass (for example, at least 2 standard deviations below the premenopausal mean) or by the presence or history of osteoporotic fracture.

- For the prevention of osteoporosis, FOSAMAX may be considered in postmenopausal women who are at risk of developing osteoporosis and for whom the desired clinical outcome is to maintain bone mass and to reduce the risk of future fracture. Bone loss is particularly rapid in postmenopausal women younger than age 60. Risk factors often associated with the development of postmenopausal osteoporosis include early menopause; moderately low bone mass (for example, at least 1 standard deviation below the mean for healthy young adult women); thin body build; Caucasian or Asian race; and family history of osteoporosis. The presence of such risk factors may be important when considering the use of FOSAMAX for prevention of osteoporosis.

59.     Among the bisphosphonates, Fosamax has been the market leader.  Fosamax was approved based on two clinical studies:  FIT 1 published in 1996 in The Lancet and FIT 2 published in 1998 in the Journal of the American Medical Association (JAMA).  In three years, Fosamax demonstrated a 47% reduction in vertebral fractures relative to placebo and a 51% reduction in hip fractures.  Fosamax did not demonstrate a significant enough reduction in non-hip nonvertebral fractures to receive that additional indication.

60.     Fosamax went generic in February of 2008.

61.     Boniva, manufactured by Roche, was approved by FDA in 2004 "for the treatment and prevention of osteoporosis in postmenopausal women. BONIVA increases bone mineral density (BMD) and reduces the incidence of vertebral fractures."

62.      Boniva's approval was based on a study referred to as the "BONE" or "Chestnut" study published in the Journal of Bone and Mineral Research by Dr. Chestnut: "Effects of Oral Ibandronate Administered Daily or Intermittently on Fracture Risk in Postmenopausal

12

Osteoporosis."  Boniva demonstrated a 62% reduction in vertebral fractures when administered daily and 50% when administered intermittently relative to placebo.  Boniva did not demonstrate a statistically significant reduction in nonvertebral fractures in the BONE study.

63.     Actonel was approved by the FDA in 1998 for "the treatment and prevention of osteoporosis in postmenopausal women. In postmenopausal women with osteoporosis, Actonel reduces the incidence of vertebral fractures and a composite endpoint of nonvertebral osteoporosis-related fractures."

64.     Atelvia was approved by the FDA in 2010 for "the treatment of osteoporosis in postmenopausal women. Bone mineral density increases achieved at one year with Atelvia are non-inferior to increases seen with risedronate sodium 5 mg (immediate-release) daily. Daily risedronate sodium 5 mg (immediate-release) has been shown to reduce the incidence of vertebral fractures and a composite endpoint of nonvertebral osteoporosis-related fractures."

65.     Atelvia has the same active ingredient found in Actonel, risedronate, but also has an enteric coating, which delays the release of the active ingredient inside the body and may lessen Gastrointestinal Adverse Events associated with the other BP drugs.

66.     Of the four drugs, only Atelvia and Actonel are approved for the reduction of both vertebral *and* nonvertebral fractures in postmenopausal osteoporosis.  The indication was based on the results of two randomized, double-blind placebo controlled clinical trials: the VERT-NA and VERT-MN studies which were performed by the Vertebral Efficacy with Risedronate Therapy (VERT) Study Group between 1993 and 1999.  The VERT studies revealed that a 5 mg daily dose of Actonel was effective in reducing new vertebral fractures (the primary endpoint) throughout the 3-year studies.

67.     Secondary endpoints in the VERT trials included the incidence of new nonvertebral fractures and changes in BMD vs. baseline at multiples sites.  Although the VERT-NA study was not powered to show a reduction in risk of nonvertebral fractures, the secondary endpoints results revealed that treatment with Actonel 5 mg reduced the incidence of nonvertebral fractures by 39% relative to placebo.

13

68.     In the VERT-MN study a 33% reduction in nonvertebral fractures was also observed but this was not statistically significant.  However, analysis of pooled data from both VERT studies revealed a 36% reduction in risk for nonvertebral fractures.  This 36% composite reduction in nonvertebral fractures was the basis for the nonvertebral indication for Actonel.  The nonvertebral fractures included a composite number of fractures in multiple nonvertebral sites including wrist, humerus, clavicle, pelvis, hip, and leg.

69.     Because hip fractures cause more morbidity and mortality than other osteoporosis-related fractures, it is very important to determine whether an anti-osteoporosis drug can protect specifically against hip fractures.

70.     Fosamax has an approved indication for protection against hip fracture.  Actonel did not have sufficient clinical data to receive FDA approval to claim efficacy in reduction in hip fractures.

71.     Despite the lack of an approved indication for protection against hip fracture for either Actonel or Atelvia, WC trains its sales representatives to promote the drugs as effective in reducing hip fractures, by informing physicians that a patient subgroup in the HIP study (published in the New England Journal of Medicine in 2001) demonstrated a statistically significant reduction in the risk of hip fractures from Actonel relative to placebo.

72.     In addition to the approved indications, the product insert for any pharmaceutical describes the drug's "mechanism of action."  Although the wording varies, the "Mechanism of Action" on the Atelvia, Actonel, Fosamax and Boniva labels describes the same process: the bisphosphonate has an affinity for bone mineral (hydroxyapatite) and inhibits osteoclast activity, reducing bone resorption.  The full "Mechanism of Action" from each label is as follows:

    a)     [Atelvia and Actonel]

        Risedronate has an affinity for hydroxyapatite crystals in bone and acts as an antiresorptive agent. At the cellular level, risedronate inhibits osteoclasts. The osteoclasts adhere normally to the bone surface, but show evidence of reduced active resorption (e.g., lack of ruffled border). Histomorphometry in rats, dogs, and minipigs showed that risedronate treatment reduces bone turnover

(activation frequency, i.e., the rate at which bone remodeling sites are activated) and bone resorption at remodeling sites.

b)    [Fosamax]

Animal studies have indicated the following mode of action. At the cellular level, alendronate shows preferential localization to sites of bone resorption, specifically under osteoclasts. The osteoclasts adhere normally to the bone surface but lack the ruffled border that is indicative of active resorption. Alendronate does not interfere with osteoclast recruitment or attachment, but it does inhibit osteoclast activity. Studies in mice on the localization of radioactive [$^3$H]alendronate in bone showed about 10-fold higher uptake on osteoclast surfaces than on osteoblast surfaces. Bones examined 6 and 49 days after [$^3$H]alendronate administration in rats and mice, respectively, showed that normal bone was formed on top of the alendronate, which was incorporated inside the matrix. While incorporated in bone matrix, alendronate is not pharmacologically active. Thus, alendronate must be continuously administered to suppress osteoclasts on newly formed resorption surfaces. Histomorphometry in baboons and rats showed that alendronate treatment reduces bone turnover (i.e., the number of sites at which bone is remodeled). In addition, bone formation

c)    [Boniva]

The action of ibandronate on bone tissue is based on its affinity for hydroxyapatite, which is part of the mineral matrix of bone. Ibandronate inhibits osteoclast activity and reduces bone resorption and turnover. In postmenopausal women, it reduces the elevated rate of bone turnover, leading to, on average, a net gain in bone mass.

**B.    The 2008 Russell Study**

73.    Until October 2009, Actonel, at that time the only approved form of risedronate, was owned, sold and marketed by Proctor & Gamble ("P&G").  During the period of Proctor & Gamble's ownership, a study on Bisphosphonates (hereafter "the Russell Study" or "the Study") was published by one P&G employee and three other scientists who had each received funding from P&G in the form of research support and honoraria for lectures.  See Russell RG, Watts NB, Ebetino E, Rogers MJ, Mechanisms of Action of bisphosphonates: similarities and differences and their potential influence on clinical efficacy, Osteoporosis Int. 19:733-759 (2008).

74.     The Russell Study does not report on any clinical data but, instead, theorizes about possible differences between the bisphosphonates with the goal of suggesting why further research might determine differences in clinical efficacy.

75.     Rather than reporting the results of any actual study or trial, the Russell Study looks at the data from other clinical studies, few, if any, of which directly compare the drugs in head-to-head clinical trials, and concludes that there *may* be differences among BPs in terms of their clinical effects, and that those differences *may* be explained by the differences in the BPs' chemical structures.

76.     The Russell Study starts from the proposition that the classic pharmacological effects of bisphosphonates ("BPs") are the result of two key properties: their affinity for bone, which causes them to bind to the bone's surface, and their inhibitory effect on FPPS and, thus, osteoclasts.  The Russell Study examines the extent to which each drug has displayed these properties, as well as a third property, which the authors call "zeta potential."  From there, the Study hypothesizes that the chemical and biochemical differences among BPs may lead to clinical differences.

77.      The Russell Study cites to earlier publications, which concluded that, in terms of affinity for bone, the drugs at issue have the rank order of risedronate (Actonel and Atelvia), ibandronate (Boniva), alendronate (Fosamax), with risedronate displaying the least affinity for bone and alendronate displaying the most.

78.     The Study authors also look at a factor that they call zeta potential which has been proposed to predict the total amount of BP that can bind to a particular area of bone surface.  The more positively charged BPs, which include ibandronate and alendronate, are predicted to attract additional BPs to bind to the bone surface via their negatively charged phosphonate moieties, thus increasing the total amount of BP that binds in one area.  On the other hand, the less positively charged BPs, including risedronate, would lead to a more negatively charged bone surface, which, the authors predict, may limit further accumulation of BPs.

79.     Third, the authors look at the BPs' inhibitory potency on FPPS.  The authors point to several studies to show that risedronate, due to its chemical structure and the particular orientation of the molecule's nitrogen atom, has a higher biochemical potency than ibandronate or alendronate.

80.     The authors of the Russell Study acknowledge that making any comparisons between the BPs as to clinical efficacy is difficult because of the absence of head-to-head trials with fracture end points.  "There are problems with comparing the clinical effects of bisphosphonates because of the lack of direct comparisons in head-to-head clinical trials with appropriate endpoints (e.g. fracture)."  However, the Russell Study nonetheless compares the results of the individual trials, despite their differing methodologies and patient subgroups, to predict why the BPs could have different clinical outcomes.

81.     In general a higher affinity for bone and a higher potential to bind more BPs to a bone's surface is thought in the medical and scientific community to lead to increased clinical effectiveness.  However, the Study's authors suggest that, in the case of risedronate, lower affinity may lead to greater distribution throughout the skeleton, allowing a broader impact and forming the basis for the nonvertebral indication.

82.     The Russell Study also proposes that the strong inhibitory action of risedronate leads to a faster speed of onset than the other BPs.  There is no clinical data to support this assertion or the assertion that risedronate may have the strongest inhibitory effect preventing bone turnover at a cellular level.

83.     The Russell study acknowledges that post approval studies have demonstrated that Alendronate (Fosamax) likely does reduce the risk of nonvertebral fractures and that Risedronate (Actonel) may likely reduce the risk of hip fractures.

84.     The Russell study is inconclusive as to whether any clinical distinctions can be made between the drugs based on its analysis of their mechanisms of action.  It asserts that each BP has a "unique profile" that might be clinically relevant and that there are likely differences

between the BPs in terms of speed of onset of fracture reduction, efficacy at different skeletal sites, the regimen to be used, the degree and duration of suppression of bone turnover and how long to treat patients.

85. At best, the Russell study is scientific conjecture about possible mechanism of action differences between the bisphosphonates. It is not the kind of clinical study that the FDA would require before a manufacturer could make a claim of superiority or even non-inferiority.

## VI.   ALLEGATIONS

### A.   Warner Chilcott Used False Science to Promote Actonel and Atelvia as Superior to Competitors

86. Relator began working for Warner Chilcott in August of 2010. He had prior experience in pharmaceutical sales at Pfizer and Pharmacia and anticipated that Warner Chilcott would take a similar view towards regulating the activities of their sales force in order to ensure compliance with FDA regulations. However, from the beginning of his employment, Relator observed WC's disregard for the rules governing pharmaceutical sales and marketing. On his first day, Relator's manager, Ted Schoenlein, told him that at Warner Chilcott, "only two things are black and white: samples and expense reports. Everything else is shades of gray."

87. Pursuant to its lack of regard for regulations, Warner Chilcott took the hypotheses from the Russell Study, exaggerated them, and taught them to its sales force as though they were fact. Even presented in their most accurate form, the conclusions from the Russell Study are theories at best. Indeed, even in the "Conclusion" section of the article, the authors refer to their proposed findings as "hypotheses" and acknowledge that "additional work will need to be done to confirm [them]." Likewise, Graham Russell, the lead author on the Study, recently gave a lecture in which he conceded that clinical studies would need to be performed to confirm their proposals about the cellular effects and the mineral binding properties of the competitor drugs.

88. Notably, although Proctor & Gamble was involved in the funding and writing of the Russell Study, presumably for the purpose of product promotion, they recognized after the Study's publication that it drew no solid conclusions and had insufficient scientific grounding to

justify using it to promote their products to physicians.  Relator asked a former Proctor & Gamble sales representative about the study and was told that under P&G the Russell Study was not used to detail physicians.

89.     On the other hand, Warner Chilcott took versions of the Russell Study theories, exaggerated and skewed in favor of their products, and made them the core of their promotions for Atelvia and Actonel, in what they called the "Mechanism of Action" story.  The "Mechanism of Action" story was the centerpiece of WC's sales training.  Sales representatives were coached on it regularly and were expected to give it as part of their sales "consultations" with physicians.

90.     WC representatives were expected to promote the baseless "Mechanism of Action" story as though it were scientifically proven in order to induce physicians to write prescriptions for Actonel and Atelvia, which were submitted to and reimbursed by public and private health insurers.  Sales representatives received performance reviews and considerations for incentive compensation based on their adherence to the "Mechanism of Action" story.  The "Mechanism of Action" story was included in all sales training modules including the Actonel Learning System and the Atelvia Sales Training Module.

91.     Managers at Warner Chilcott developed the MOA story because they recognized that, despite the indication of Actonel and Atelvia for nonvertebral fractures, many physicians did not perceive significant differences between the bisphosphonates and were, thus, inclined to prescribe the lower-priced alendronate (Fosamax and the much less expensive generic Fosamax) for their patients than the expensive risedronate.  Many physicians believed that risedronate's superior endpoints for nonvertebral fractures in their clinical trials resulted less from the drug's actual superiority, and more from the fact the risedronate studies were performed after the clinical trials for Fosamax and that Proctor & Gamble was able to learn from the earlier studies and structure their trials to get the best results, including pooling data concerning the nonvertebral fractures from two separate arms of the VERT trial, to obtain the indication for nonvertebral fractures.

19

92.     As such, Defendants wanted a way to overcome objections from physicians that all of the BP drugs were essentially the same and to distinguish risedronate from the other BPs as "unique" among the BP drugs.

93.     Defendants relied on the Russell Study to develop a misleading Mechanism of Action (MOA) story to convey to physicians that risedronate has superior efficacy for preventing fractures in postmenopausal osteoporosis.

94.     Put simply, the MOA story as presented to sales representatives is the following: "Actonel / Atelvia has a lower affinity for bone unlike Fosamax and Boniva that have medium to high affinity for bone.  That means Actonel / Atelvia won't simply stick to the bone but will be able to penetrate vertebral and nonvertebral bone and sink deeper into trabecular bone. Penetrating into the bone allows Actonel / Atelvia to go deep into micro-fractures and heal bone. Additionally, Actonel / Atelvia's lower affinity for bone increases reentry into circulation leading to broader distribution throughout the skeleton than high-affinity drugs."

95.     Significantly, the Russell Study was published prior to Warner Chilcott's submission of a New Drug Application for Atelvia.  Defendants apparently did not seek FDA approval for inclusion of the Russell study on the label, which would have permitted them to state that the Study provided clinical evidence warranting a claim of superiority for risedronate over other bisphosphonates or even a claim that risedronate has a unique "Mechanism of Action."

96.     Warner Chilcott, moreover, used false and misleading representations of the Russell Study's conclusions in its marketing. Defendants selected from the Russell Study those theories that are favorable to marketing of Actonel and Atelvia, exaggerated them and promoted them as fact.

97.     For example, Defendants trained their sales force on the "two key properties" contributing to the pharmacological effects of bisphosphonates: (1) their ability to bind to bone or mineral (or "affinity"); and (2) their ability to bind and inhibit a key enzyme within the

osteoclast necessary for bone resorption (also called "potency").  Focusing on these two properties alone was misleading as it selectively ignored the "zeta potential" factor described in the Russell Study, which was not favorable to risedronate.

98.     The MOA story's version of the affinity factor was particularly skewed.  WC's "Learning System" for Actonel made no mention of the general evidence suggesting that higher bone-binding affinity would increase efficacy.  Instead, the training materials stated that the "clinical significance is not known," but that the "differences in affinity are thought to affect the distribution of the bisphosphonates in the skeleton."  The training materials stated that the strongest binding drugs "would be expected" to have less reentry into the circulation, a proposition not even suggested in the Russell Study.

99.     Similarly, WC's presentation of the potency factor promoted the theory that risedronate's molecular structure allows for tighter binding with and, thus, maximum inhibition of the FPPS enzyme as though this theory had been proven to be true.  For example, the Actonel "Learning System" included a computer-generated depiction of the way a risedronate molecule theoretically binds with the FPPS enzyme with the caption, "Below is a depiction of the risedronate molecule bound to the FPPS enzyme.  You will notice the snug fit between the two." There is no scientific basis for the claim that the "fit" between the risedronate molecule and the FFPS enzyme impacts the level of FPPS inhibition or the drug's efficacy.

100.     In addition, the MOA story posited that while all of the nitrogen-containing BPs inhibit osteoclasts through a stronger pathway than the non-nitrogen osteoclasts, it is only the heterocyclic BPs such as risedronate that are thought to "induce a conformational change that locks the bisphosphonate in the FPS enzyme with virtually irreversible binding."  Relying exclusively on the Russell Study, the MOA story instructed that it is this mechanism that may allow risedronate "to better inhibit osteoclastic resorption" despite the lack of any clinical data to support this claim.

101.     From this explanation of the characteristics of the risedronate molecule, WC made the further assertions in its Actonel Learning Module that "Actonel has unique structural

characteristics that contribute to th[e] product's mechanism of action" and "Actonel has important advantages." Throughout the Learning Module, WC repeated the same assertions that "No two bisphosphonates have the same combination of mineral affinity and enzyme inhibition potency. These differences may account for observed differences in clinical pharmacology and efficacy, although head-to-head clinical trials have not been conducted. Actonel has a high potency of the FPPS target enzyme and moderate mineral affinity."

102.    Defendants trained their sales force extensively on the MOA story, particularly in how it should be used to sell Atelvia to physicians.   Relator was taught in the August 2010 training class about the "Mechanism of Action Conversation". The class was told by Warner Chilcott's president, W. Carlton Reichel that the FDA did not allow them to leave behind the Russell study, but Reichel nevertheless directed sales representatives to promote the MOA story and to make false representations that the Russell study provided scientific support for the  MOA story.

103.    Relator was explicitly told by trainers, as well Warner Chilcott's president, that they must thoroughly understand the Russell Study and the Mechanism of Action Story and have the "Mechanism of Action Conversation" with every physician during their business conversations.  These "business conversations" are conversations with physicians in which WC sales representatives gained physician's commitments to write additional Actonel or Atelvia prescriptions.

104.    Warner Chilcott understood that use of the MOA story by sales representatives was critical to success in selling its drugs and causing physicians to prescribe the more expensive Actonel and Atelvia over the less expensive generic Fosamax favored by insurers.

105.    Warner Chilcott's Vice President of Clinical Development, Jim Caminis, taught the misleading MOA story to new sales representatives in sales training meetings.

106.    The importance of the MOA story was emphasized in a role playing exercise immediately following the Vice President's training in which the trainees practiced delivering

the message to trainers, and a second role playing session the next day entitled, "Telling the Story with MOA."

107.    The trainees were ultimately assessed on their effective use of the MOA story in a session titled "Selling to the 'Splitter,'" in which the trainees practiced pitching the MOA story to a physician who believes that all bisphosphonates are the same, as well as training sessions "Selling to the Boniva Loyalist" and "Selling to the Generic Alendronate Loyalist."

108.    Even in the informal "Chat with the President," the President of Warner Chilcott, W. Carlton Reichel, emphasized the importance of the MOA story, instructing the sales representatives that, although they could not give copies the Russell Study to physicians, they must have a full understanding of the MOA story and have the "Mechanism of Action Conversation" as part of a "business consultation" with every physician.

109.    In one training session, the sales representatives were encouraged to use sponges to visually demonstrate the MOA story to physicians.  The demonstration consisted of pouring syrup on one sponge and pour water on a second.  The sales representatives were instructed to tell physicians that the sponge in syrup was like Fosamax or Boniva on the bone – the mineral affinity was so high that it would adhere to the surface of the bone, but would not penetrate into the bone.  Actonel and Atelvia, on the other hand, acted like the water, they would not just adhere to the outside of the bone, but would act on the inside as well.  This presentation was intended to convey the superiority of Actonel and Atelvia, despite having no FDA approval and no basis in clinical research.

110.    Relator approached his manager, Ted Schoenlein, and explained that he believed that the "syrup demonstration" was unscientific and misleading and in violation of FDA regulations.  Relator understood that illegal sales promotion could result in a determination that Warner Chilcott caused the submission of false claims to federal and states health programs as well as private insurers.   Relator's manager rebuffed his arguments and stated that "Carl," the Warner Chilcott President, disagreed.

111.     Warner Chilcott's sales representatives were repeatedly instructed both during and after the August 2010 training to have the Mechanism of Action Conversation with every physician and thereby to claim superiority of Actonel and Atelvia over competitors in the BP class.

112.     Warner Chilcott promoted the baseless MOA story through its sales representatives nationwide, including many in California and Illinois.  These sales representatives used the MOA story to promote Actonel and Atelvia to California and Illinois-based physicians, causing them to prescribe Actonel and Atelvia to patients, many of whom were insured by private insurers in California and Illinois.

113.     For example, the following are among the Warner Chilcott sales representatives who promoted WC's products to California-based physicians, who in turn wrote prescriptions reimbursed by California-serving private insurers:

    a)      Gabrielle Abernathy,

    b)      Adam Appril,

    c)      Anita Behnam,

    d)      Roxann Barnes,

    e)      Eric Barnes,

    f)      Jane Bevilacqua,

    g)      Sharus Bishop,

    h)      Kaitlin Black,

    i)      Tonja Burrus,

    j)      Priscilla Cerda,

    k)      Eduardo Chang,

    l)      Kathelyne Claborn,

    m)      Donna Cromer,

    n)      RJ Cruz,

o)      Marc Cua,

p)      Andrea Cunningham,

q)      Sarauniya Dasin,

r)      Patrick Day,

s)      Mayar Daya,

t)      Steven DeNuccio,

u)      John Fairlie,

v)      Elizabeth Flores,

w)      Amy Foster,

x)      Sarah Frese,

y)      Brandon Giovanni,

z)      Matt Grimmig,

aa)     Laura Gustorf,

bb)     Danielle Hall,

cc)     Erica Handalian,

dd)     David Harridge,

ee)     David Heiland,

ff)     Toniann Huartson,

gg)     Kara Jacobson,

hh)     Daniel Jardin,

ii)     Schirrell Johnson,

jj)     Kelli Karis,

kk)     Briana Kenney,

ll)     Jessica Killion,

mm)     Elizabeth Kimpe,

nn)     Gene Kranz,

oo)    Michele Lancaster,

pp)    Kristopher Menze,

qq)    Tahlia Neumann,

rr)    Troy Nguyen,

ss)    Alessandra O'Donnell,

tt)    Ashley O'Hare,

uu)    Jessica Oliver,

vv)    Stefany Parrado,

ww)    Shane Pierce,

xx)    Prabhakar Polani,

yy)    Marissa Prescott,

zz)    Carleton Reed,

aaa)    Keyana Robinson,

bbb)    Marina Rodina,

ccc)    Brian Saiki,

ddd)    Ramon Santos,

eee)    Lindsay Sarkisian,

fff)    Tara Scheibel,

ggg)    Jennifer Scott,

hhh)    Alicia Senour,

iii)    Limor Shapira,

jjj)    Russell Shood,

kkk)    Aaron Snyder,

lll)    Michelle Snyder,

mmm)  Charlene Standridge,

nnn)    Sarah Starling,

ooo)   Paul Swaney,

ppp)   Tarek Tabbara,

qqq)   Kara Tallini,

rrr)   Donye Taylor,

sss)   Pat Telles,

ttt)   Dove Thiess,

uuu)   Tillie Thomsen,

vvv)   Todd Tomlinson,

www)  Thu Ton,

xxx)   Erick Torres,

yyy)   Melanie Towers,

zzz)   Todd Valdez,

aaaa)  Sandy Vaziri, and

bbbb)  Steven Walden.

114.   The following are Warner Chilcott sales representatives who promoted WC's products to Illinois-based physicians who in turn wrote prescriptions reimbursed by Illinois-serving private insurers:

a)   Sahar Ahmadi,

b)   Melissa Applegate,

c)   John Bagel,

d)   Ashley Baker,

e)   Christopher Balija,

f)   Kristine Benker,

g)   Patrick Burkhart,

h)   Tiffany Caliendo,

i)   Madonna Cifonie,

j)      Deardra Cook (White),

k)      Brandon Cotie,

l)      Courtney DeHoyos,

m)      Sabrina Di Iorio,

n)      Linda Eichhorn,

o)      Adam Fleischer,

p)      Lindsay Harmon,

q)      Sharon Heneghan,

r)      Tanya Hrudka,

s)      Sarah Hunt,

t)      Tiffanie Janke,

u)      Brooke Karagozian,

v)      Holly Kennedy,

w)      Knute Landry,

x)      Jessica Lynch,

y)      Hilary Maskas,

z)      Autumn McLaughlin,

aa)     Douglas Moy,

bb)     Jurate Neuman,

cc)     Virgilio Pardales,

dd)     Bernice Park,

ee)     Denise Polaski,

ff)     Stacey Rongey,

gg)     Brooklyn Rosene,

hh)     Mark Somraty,

ii)     Allison Terpstra,

jj)    Jenna Tipps, and

kk)    Sheena Velazquez.

115.    Relator objected to the false claims of superiority made by Warner Chilcott in its sales promotions.

116.    In September and October of 2010 Relator again challenged the legality of the "Mechanism of Action Conversation," and expressed his belief that it was not consistent with the FDA-approved product insert, and that prescriptions written as a result of Warner Chilcott's promotion of the MOA story would constitute false or fraudulent claims to federal, state and private insurers. .  Relator's manager responded each time with a lengthy answer, concluding "Carl doesn't feel that way."

117.    In October of 2010 Relator's manager accompanied Relator on a physician visit. Following the visit, Relator's manager filled out a "Sales Representative Performance Evaluation & Coaching Report," on which, under the "Product Knowledge" heading, he wrote, "A product knowledge area that I did not observe, that also works well is the MOA story, differentiating the Bone Affinity and Enzyme Binding Affinity.  Developing a deep understanding of the MOA story and effectively using that story as the reason there is a non-vert and speed difference will help you transition into a quality Business Conversation.  I'd encourage you to learn that story and use it in your sales calls."

118.    Again in January 2011, Relator raised concerns with his District Manager over the false claims of superiority made through the "MOA Conversation" and the fraudulence of any prescriptions written based on the MOA story.  Relator was told that "Carl feels differently" and that the "story makes sense" so he should use it in his business conversations with physicians.

119.    Defendants trained their sales representatives to claim superiority of Actonel and Atelvia over competitor products in the class through distorted interpretations of clinical data as well as through the MOA story.  For example, the HIP study showed a reduction of hip fractures for risedronate in one arm by 60% relative to placebo but the FDA did not grant WC an

indication for hip fracture reduction because the numbers in that phase of the trial were not statistically significant due to small sample size.  By comparison, the FIT 1 & 2 (Fosamax pivotal trials) shows Fosamax hip fracture reduction at 50% and Fosamax was granted an indication by the FDA for hip fracture reduction.  There is also data in the FIT 1 & 2 studies to support evidence that Fosamax protects against nonverterbral fractures even though Fosamax does not have that approved indication.

120.    WC sales representatives were trained that when "hip fracture protection" questions arise with physicians, they should agree that Fosamax trials had a 50% reduction in fractures, but then point out that Risedronate had a 60% reduction in the HIP study (even though it does not have an approved indication for the same).

121.    WC sales representatives were thereby trained to equate the Fosamax PI indication for hip protection with the data for risedronate in the HIP study.  Then, WC reps were instructed to mention that risedronate has an approved indication for protection against nonvertebral fractures and that Fosamax has no such indication without mentioning the data in support of nonvertebral fractures for Fosamax.

122.    In these ways, sales training for sales representatives was purposefully skewed toward false claims of superiority of Actonel and Atelvia over Fosamax (generic and brand) and Boniva.  These claims were made even though there is some evidence from head-to-head studies sponsored by Merck (FACT and FACT Extension) that Fosamax (alendronate) may be more effective than risedronate in increasing Bone Mass Density (BMD), a significant factor in protecting against osteoporotic fractures.

123.    Moreover, Defendants trained their sales representatives to make numerous unfounded head to head comparisons with competitor drugs by comparing the incidence of fracture reduction in different subgroups within different studies without accounting for study design, population, dosage or administration or other confounding factors.

124.    For example, in one WC powerpoint entitled "Boniva overview," WC took data from two very different clinical trials for Actonel and Boniva and trained its sales representatives

that Boniva has a slower efficacy stating "Ibandronate did not reduce the risk of fractures in one year" and stating "How Actonel compares: Risedronate reduced the risk of vertebral fractures by 65% in 1 year."   The  WC powerpoint presented Actonel as superior to Boniva in data supporting its nonvertebral fracture protection indication, rejecting secondary data from Boniva researchers of some reduction of nonvertebral fracture risk and stating "Actonel is the only oral bisphosphonate approved to reduce the risk of both vertebral and nonvertebral fractures."

125.    Defendants also trained their sales representatives with a partial and distorted view of the efficacy data available for competitor drugs.  For example, in a WC powerpoint concerning Generic Alendronate or Fosamax, WC stated that Fosamax's clinical data demonstrates that it does not significantly reduce nonvertebral fractures citing to one study.  WC ignored other studies and retrospective analyses suggesting that Fosamax and its generic equivalent may have some efficacy for nonvertebral fractures.  The WC powerpoint also stated that the "hip fracture efficacy" for Fosamax was "barely significant" even though Fosamax is the only BP drug with a hip fracture indication.

126.    Defendants also trained their sales representatives that Actonel is superior to generic Fosamax because generics only require one study demonstrating bioequivalence to the branded drug and suggesting that the generic is of lesser quality because of "difference in size, shape and color: and because generic alendronate is manufactured by many different companies."

127.    WC's marketing materials presented the superiority of Actonel and Atelvia as overriding concerns over cost.  By using images of fractured bones, WC implied that patients taking generic Fosamax may save money on the medication but will ultimately lose any savings due to the cost of unnecessary fractures.

128.    Defendants' promotions were false and misleading and claimed superiority to competitor drugs without FDA approval for such claims or a sound scientific basis for such claims.

129.    Claims for superiority based on the MOA story or otherwise constitute misbranding.  Once misbranded, these drugs cannot be delivered in interstate commerce, and are not eligible for reimbursement.

130.    Warner Chilcott persuaded physicians to write prescriptions for Atelvia and Actonel using the false and misleading MOA story as well as other false and misleading claims of superiority.  Reimbursement claims for these prescriptions were then submitted to insurers nationwide, including private insurers in California and Illinois.

131.    Defendants' promotions caused the submission of claims to California and Illinois health insurers for drugs that were misbranded and ineligible for reimbursement.  In addition, Defendants' promotions caused the submission of claims to California and Illinois health insurers for prescriptions that were written based on knowing falsehoods promoted by Defendants through its sales force.  Each of these submissions constitutes a false or fraudulent claim within the meaning of the CIFPA and the IIFPCA.

**B.      Warner Chilcott Falsely Claimed that Patients on Atelvia Demonstrated Higher Compliance and Adherence**

132.    Defendants promoted an additional misleading message that patient compliance and adherence is higher with Atelvia than other bisphosphonates.  For the purposes of this Complaint, compliance is defined as the extent to which a patient takes a drug as instructed and adherence is defined as a patient's persistence in taking a drug correctly over time.

133.    Atelvia differs from Actonel, Boniva and Fosamax in that it has an enteric coating, a barrier that prevents the medication's release before it reaches the intestine.  However, Atelvia's label does not support a claim that Atelvia has demonstrated higher rates of patient compliance or adherence, nor did any of the Clinical Trials submitted to the FDA provide any evidence of improved compliance or adherence, as compared with other bisphosphonates.

134.    Defendants' compliance and adherence claims are derived from the drugs' dosing requirements.  Specifically, a patient taking Actonel, Fosamax or Boniva, must take the medication first thing in the morning and then wait 30-60 minutes before eating.  Atelvia, on the

other hand, because of its enteric coating, is taken after eating. The dosing requirements themselves are accurate and contained on the drugs' product inserts.  However, there is no scientific basis for asserting that the differing dosing regimens will result in higher patient compliance and adherence with Atelvia.

135.    In fact, although the requirement that a patient wait 30 minutes before eating may be prohibitive for some, others may find it difficult to comply with Atelvia's restrictions that it *cannot* be taken on an empty stomach.  Atelvia must be taken immediately after breakfast, after which, like the other bisphosphonates, the patient cannot lie down for 30 minutes.  The product insert specifically states that, when administered before breakfast Atelvia resulted in a significantly higher incidence of abdominal pain as compared with immediate-release risedronate (Actonel).

136.    Allegations of improved patient compliance and adherence that are not supported by adequate evidence are fraudulent.

137.    The FDA has taken action against pharmaceutical manufacturers who have made similar baseless claims.  Even where a company's drug product has a dosing regimen that is more convenient, or other properties that would cause the pharmaceutical to be better tolerated, the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") has prohibited any promotions that suggest the drug improves patient convenience, unless there is substantial clinical evidence supporting the claim.  See Warning Letter to Romark Laboratories, L.C., Department of Health and Human Services, DDMAC (May 25, 2009) (ordering the cessation of materials promoting superior compliance with the company's drug, taken twice a day, over competitor's drug, taken three times a day); Warning Letter to 3M Pharmaceuticals, Department of Health and Human Services, DDMAC (November 1, 1999) (requiring the company to remove the claim "convenient BID dosing for patient compliance" from promotional materials, where it was not supported by adequate evidence); and Warning Letter to BioMarin Pharmaceutical, Inc., Department of Health and Human Services, DDMAC, October 11, 2006 (requiring the company to cease promotions suggesting that the flavor enhancers in their product

improve rates of compliance).  As the DDMAC has noted, "[p]atient compliance may be influenced by a number of factors," including economic variables, meaning that a patient may be less likely to continue to take a more expensive drug, like Atelvia.  *See* Warning Letter to 3M Pharmaceuticals.

138.    Despite its lack of evidence Warner Chilcott encouraged the sales force to use the improved patient compliance and adherence messages to promote Atelvia.  When questioned about the data to support these claims, sales representatives were instructed to tell physicians that Defendants had the data "on file."

139.    In January 2011, an email was sent from WC management, originating from California-based regional manager Sirine Tabbara, and sent to several California district managers including Tina Hendrixson, Randy Peirce, Timothy Garcia, and Kristi Ambs, instructing representatives to perform a demonstration using vinegar on the enteric-coated Atelvia and on Actonel and competitor medications.  Representatives were instructed to put Fosamax, Boniva, Actonel and Atelvia tablets in cups of vinegar, in which Fosamax, Boniva and Actonel would begin to dissolve immediately, but the Atelvia tablet would remain whole.  This was used to "demonstrate" to physicians how, unlike competitor bisphosphonates, Atelvia's enteric coating prevents the drug from breaking down in the stomach. Sales representatives were encouraged to use the visual to argue that Atelvia is better tolerated than the other bisphosphonates, thus increasing patient compliance. The demonstration was not scientific and manipulates the facts to support the false conclusion that patients taking Atelvia demonstrate better compliance and adherence.

140.    Sales representatives were instructed to encourage physicians to use the compliance and adherence messages to gain "prior authorizations" for Atelvia from private insurers.

141.    As described herein in paragraphs 161 through 181, Defendants provided the sales team with pre-packaged letters for physicians to send to insurers to obtain authorization for reimbursement of the more expensive Atelvia over the less expensive drugs on insurers'

formularies (for example, generic Fosamax). These pre-packaged lettered included messages such as, "[t]he availability of Atelvia will improve adherence to osteoporosis treatment and thereby reduce the incidence of osteoporotic fractures" and "Atelvia (risedronate sodium tablets) will help with compliance and absorption."

142.    Defendants' sales representatives promoted these false messages of patients' improved adherence and compliance on Atelva nationwide.  These false messages of patients' improved adherence and compliance with use of Atelvia (as compared to other osteoporosis medications) caused physicians in California and Illinois to write  prescriptions for Atelvia , and those prescriptions were reimbursed by health insurers doing business in California and Illinoisprivate health insurers.

143.    Like the MOA story, Defendants' compliance and adherence promotions were false and misleading, rendering the drugs misbranded.  Each submission to a private California or Illinois health plan for reimbursement for a misbranded product and each prescription c Defendants caused to be written with its false claims of superiority constitutes a false or fraudulent claim within the meaning of the CIFPA and the IICFPA.

C.    **Defendants Used Financial Inducements To Influence Physicians' Prescribing Practices**

144.    Defendants also used kickback schemes, including numerous expensive physician dinners, speaker payments and billing assistance to induce physicians to increase the number of prescriptions written for Defendants' products.

145.    Defendants utilized frequent dinners to disseminate its promotional messages for Atelvia and Actonel.  Sales representatives were expected to hold two at least "Med Eds," dinners with physicians held at fine local restaurants, per week.  Regional Manager, Sirine Tabbara, located in Orange County, CA, encouraged District Managers to "make sure that reps are doing as many med eds as possible while we are in [Atelvia] launch mode."

146.    Defendants spent millions on these physician Med Eds.  Certain sales representatives spent over $10,000 per month on the Warner Chilcott Med Eds.  For example, in

October, 2010, the California sales teams managed by Jennifer Behling, Broderick Carter, Joe Utecht, Randy Peirce, Kristi Ambs and Tina Hendrixson each spent over $20,000 on Med Eds. Tina Hendrixson's team of nine sales reps in the Los Angeles area alone spent over $46,000 Relator's sales region, which included California, totaled over $300,000 monthly on Med Ed expenditures.

147.    When Relator asked his managers why the Med Eds were so important, he was told that restaurants, not offices, are a better venue for "business conversations."  Sales reps were instructed to use the dinners to get commitments from doctors that they would write a certain number of Atelvia scripts over a set period of time.

148.    For example, a March 12, 2011 email from District Manager Ted Schoenlein concerning "Atelvia Launch Expectations" set forth the Warner Chilcott sales model including "Consistent Business Conversations . . . There is no reason or excuse why any physician would not use Atelvia to the Market Leadership level."  Schoenlein went on to explain how the Med Eds were successfully utilized to increase physicians' Atelvia prescriptions: "Med. Eds. are our best-selling venue and Early Experience doctors have excellent feedback to share."

149.    Warner Chilcott's data confirmed that the Med Ed speaker kickbacks successfully induced physicians to write additional prescriptions for Defendants' products.  In an email, Randy Peirce, a Warner Chilcott District Manager in the Los Angeles area, confirmed that "if you were to force rank districts by the percentage of med eds with a speaker utilized you see the higher percentage districts significantly outperformed the rest."

150.    Additionally, Defendants trained and paid a high number of "advocate speakers" to participate in the Med Eds.  In the above-referenced March 12, 2011 email, Schoenlein went on to instruct that sales representatives, "Average a minimum of two quality Med Ed's [sic] per week with majority using an advocate speaker and a minimum of two lunches per week . . . Complete your Preceptorship with a specialist who does high volume in Osteoporosis in January."  Each sales representative was expected to have at least ten speakers in his or her territory. Overall, Defendants had more than 2000 trained speakers across the country.  Warner

Chilcott management believed that these advocate speakers were a "huge business opportunity." Every speaker was expected to give Atelvia at least a 25 percent market share of their prescriptions for osteoporosis medications, and the "speaker" positions were offered to physicians in order to induce them to increase the number of prescriptions written for Atelvia. Thus, Relator's District Manager, Ted Schoenlein, wrote in an email, "If on average our Advocates are at 25% or more market share your territory business and our direct business would be significantly increased."

151.    Speakers were paid approximately $125 to $150 for their speaker training and between approximately $400 and $900 for each Med Ed they attended ($400 to $500 for primary care physicians; $800 to $900 for specialists, such as rheumatologists).  At the Med Eds, promotionally called "Speaker Led Roundtable Discussions," the advocate speakers were, as the name implies, expected to promote Atelvia and Actonel to their fellow physicians.

152.    Defendants maintained over 1,700 trained speakers, many of whom were rarely, if ever, utilized.  Thus, Defendants paid physicians to be trained as "speakers," (i.e. paid physicians to listen to the promotional messages for Actonel and Atelvia) even though the company knew that additional trained speakers were not needed and would not be used.  These training payments were disguised kickbacks, offered to reward high-prescribers of Defendants' products, and to induce others to increase prescriptions.

153.    Many of the physicians paid kickbacks through speaker payments were located in California and Illinois.  For example, Defendants paid the following California-based physicians kickbacks in the form of speaker payments:

   a)  Jacquelyn Cortez, located in Placentia, CA,

   b)  Fares Rabadi, located in Northridge, CA,

   c)  Benjamin Yasharel, located in Calabasas, CA,

   d)  Ravneet Singh, located in Redlands, CA,

   e)  David Lu, located in Torrance, CA,

f)      Jason Boutros, located in Pasadena, CA,

g)      Paul Hung-Jen Chu, located in Los Angeles, CA,

h)      Samuel Malayan, locataed in Glendale, CA,

i)      Alvaro Caceres, located in Delano, CA,

j)      Hicham Siouty, located in Palos Verdes Estates, CA,

k)      Zune Cormier, located in Rowland Heights, CA,

l)      Brian Cormier, located in Ripon, CA,

m)     Solomon Forouzesh, located in Culver City, CA,

n)      Albert Katz, located in Tarzana, CA,

o)      Neville Udwadia, located in Monterey, CA,

p)      En Lai, located in Monterey Park, CA,

q)      Bosheng Qiu, located in Alhambra, CA,

r)      Edward Ko, located in San Francisco, CA,

s)      Scott Middleton, located in La Habra, CA,

t)      Ku-Juey Raymond Chang, located in Lake Forest, CA,

u)      Brian Huh, located in Los Angeles, CA,

v)      Antonio Luza, located in Fair Oaks, CA,

w)      Timothy M. Spiegel, located in Santa Barbara, CA,

x)      Susan Lemon, located in Santa Ynez, CA,

y)      Andy Ho, located in Westminster, CA,

z)      Dipti Doshi, located in Cerritos, CA,

aa)     Anan Faidi, located in Stockton, CA,

bb)     Eric Lee located in Diamond Bar, CA,

cc)     Sunny Wong, located in Monterey Park, CA,

dd)      Lisa Karamardian, located in Newport Coast, CA,

ee)     Ashiq Patel, located in Lancaster, CA,

ff) Jack Waxman, located in Santa Rosa, CA,

gg) Damon Baskin, located in Pacific Palisades, CA,

hh) Lan Thi Hoang Nguyen, located in Westminster, CA,

ii) Mim Mulford, located in Mission Viejo, CA,

jj) Glenn M. Grossman, located in West Hills, CA,

kk) Ralph Mayer, located in Los Angeles, CA,

ll) Roger Kornu, located in Irvine, CA,

mm) Maryam Hekmat, located in San Diego, CA, and

nn) Hemmal Kothary, located in Bakersfield, CA.

154. Defendants paid the following Illinois-based physicians kickbacks in the form of speaker payments:

a) Scott M. Multack, located in La Grange, IL,

b) Pamela Dorne, located in Hinsdale, IL,

c) Steven Disanti located in Genoa, IL,

d) Alexander Delgadillo, located in Batavia, IL,

e) Buthaina Jabir, located in Plainfield, IL,

f) James Lengemann, located in Aurora, IL,

g) Jeffrey Kyrouac, located in Champaign, IL,

h) Donald Dedonato, located in Barrington, IL,

i) Beth Padin, located in Montgomery, IL,

j) Robert Hozman, located in Skokie, IL,

k) Richard Gainey, located in Hinsdale, IL,

l) Kelley J. London, located in Lake Forest, IL,

m) Fadi Habib, located in Chicago, IL,

n) Edward, Kirsh, located in Chicago, IL,

o) Gary Stuck, located in Indian Head Park, IL,

p)      Donald Adeli, located in Oak Park, IL,

q)      Samuel Leung, located in Chicago, IL,

r)      Janeta Dimante, located in Geneva, IL

s)      Ira Fenton, located in Northbrook, IL,

t)      Terrence Barrett, located in Westmont, IL,

u)      Steven Bielski, located in Geneva, IL,

v)      Abraham Shashoua, located in Chicago, IL,

w)      Amanda Myers, located in Wilmette, IL,

x)      William Bayer, located in Carol Stream, IL,

y)      Bruce A. Rosenzweig, located in Chicago, IL,

z)      Umang Patel, located in Woodridge, IL,

aa)     Carl Cucco, located in Palatine, IL,

bb)     Barry Riskin, located in Champaign, IL,

cc)     Anthony Pick, located in Northbrook, IL,

dd)     Joyce Chams-Spitz, located in Chicago, IL,

ee)     Larry Overcash, located in Morton, IL,

ff)     Jeffrey S. Pfeiffer, located in Decatur, IL,

gg)     Kathleen Slugocki, located in Chicago, IL,

hh)     Roy Tsuda, located in Decatur, IL,

ii)     Serafin Chua, located in Chicago, IL, and

jj)     Ibrahim Alghafeer, located in Naperville, IL.

155.    Several of the California-based physicians were among Warner Chilcott's highest-paid doctors in the country in terms of speaker fee kickbacks.  Warner Chilcott set a maximum annual level of "honoraria" that any one speaker can be paid through the speaker program.  As of May, 2011, three physicians had already exceeded that annual cap, two of whom

(Jacquelyn Cortez and Neville Udwadia) were based in California.  Fifteen other California providers had received over 50 percent of the maximum annual compensation by that date.

156.    The expensive meals provided to physicians, the payments to advocacy speakers, and the assistance that the sales representatives provided filling out the prior authorization forms and letters (detailed below) all constitute things of value.

157.    Additionally, at least one purpose of the provision of each of these items and services was to induce or reward physicians for prescribing, referring or recommending Defendants' products.

158.    Each physician listed above who received kickbacks through speaker fee payments agreed to write prescriptions for Actonel and Atelvia.

159.    Warner Chilcott's payments of speaker fees were a causal factor in the decision made by the physicians listed above to write prescriptions for Actonel and Atelvia.

160.    Each speaker fee payment and free meal and other entertainment, constituted a reward or kickback given to physicians in California and Illinois.  Claims submitted to insurers doing business in California and Illinois that are induced through kickbacks, including speaker fee payments, meals and entertainment as described above, are false or fraudulent claims under the CIFPA and the IICFPA and give rise to liability under the CIFPA and the IICFPA.

**D.    Defendants Caused Submission of Falsified Prior Authorization Forms Material to False or Fraudulent Claims Submitted to Private Insurers in California and Illinois.**

161.    WC provided assistance to physicians who agreed to prescribe Actonel and Atelvia by assisting their offices with completion of "pre authorization" forms to support reimbursement of WC drugs even where the insurer had less expensive equivalent drugs on formulary including generic Fosamax.

162.    In January of 2011, at Warner Chilcott's national launch meeting for Atelvia held in Orlando, Florida, WC sales reps operating nationwide, including California and Illinois, were

instructed to "help offices fill out prior authorization forms" to facilitate the acceptance of the newly approved drug.

163.    Relator spoke with his manager and questioned whether it was legal to have Warner Chilcott representatives fill out prior authorization forms, but he was told "management said it was fine."

164.    Atelvia, a new drug with generic alternatives, is not a preferred brand drug on the majority of insurers' drug formularies, including private insurers in California and Illinois.  For example, Atelvia is not a preferred drug for any of the three largest insurers in California: Anthem Blue Cross, Kaiser, and Blue Shield of California.  Anthem Blue Cross includes Actonel as a covered drug, but not Atelvia.  Kaiser does not include Actonel or Atelvia as a covered drug. Blue Shield of California lists Actonel and Atelvia as Tier 3 non-preferred medications on its large group plans and on its individual and small group plans lists Actonel, but not Atelvia, as a covered drug.  All three insurers cover alendronate (generic Fosamax) with no additional requirements.

165.    Likewise, Atelvia is not a not a preferred medication on the formularies of the largest insurers in Illinois: HCSC Group, Humana Group, United Health Group, and Health Alliance Midwest, Inc.  HCSC Group provides coverage for Actonel, but does not cover Atelvia. Humana lists both Actonel and Atelvia as Tier 3 non-preferred medications.  United Health Group also lists Actonel and Atelvia as Tier 3 non-preferred medications, with an additional provision that Atelvia may be excluded.  Health Alliance Midwest, Inc. covers Actonel and Atelvia only after the patient has tried ibandronate or alendronate.  All four Illinois insurers cover alendronate with no additional requirements.

166.    In order to obtain insurance coverage for a non-preferred medication, the physician or patient must convince the insurer that the patient has a particular need for the medication or that the patient meets certain requirements, such as having first unsuccessfully tried a generic medication in the same category.

167.     Warner Chilcott identified individual insurers' requirements for approving Atelvia coverage (including insurers in California and Illinois) and directed sales representatives to assist physicians in obtaining these insurers' approval using the insurers' criteria.

168.     Warner Chilcott instructed its sales representatives to complete prior authorization forms and to use pre-packaged letters with criteria justifying reimbursement under a particular insurer's formulary whether or not an individual patient met those criteria.  For example, Warner Chilcott distributed a formulary guide which identified Atelvia 35mg as a Tier 2 medication for Blue Shield of California's HMO plan and instructed that "Intolerance to Alendronate" be written on the prior authorization form in order to receive the insurer's coverage.

169.     Sales representatives thus "assisted" physicians in filling out prior authorization forms for patients covered by Blue Shield of California by adding "Intolerance to Alendronate" on the forms, even where the patient had no such intolerance.

170.     Such prior authorization forms completed to satisfy insurance requirements rather than to describe the patient's individual condition are false or fraudulent statements material to a false or fraudulent claim under CIFPA and IICFPA.

171.     In February of 2011, Relator's District Manager forwarded an email from Gilbert Gonzales, District Manager in Texas, with an attached "Prior Authorization Toolbox."  The Toolbox contained the forms required by several private insurers to obtain approval for a drug. It also contained several letters written with the specific verbiage that Warner Chilcott believed would persuade insurers to approve payment for Atelvia.  The letters were designed to be modified with physician and patient information, and then copied and pasted onto clinic letterhead and sent to the insurers either along with the prior authorization form, or in response to an initial denial for prior authorization.

172.     The letters included in the Prior Authorization Toolbox each provided different reasons why a patient may respond better to Atelvia than another medication.  For example, one letter said that the patient needed to be able to eat first thing in the morning with her medications;

another said that the patient had already tried all the competitor medications.  However, management's instructions made clear that the letter chosen for use should not necessarily reflect the individual patient's need, rather it should be "chosen based on the response from the managed care company and/or pharmacy."

173.    Warner Chilcott's sales representatives thus assisted and caused physicians to submit false statements to insurers in order to obtain reimbursement for Atelvia prescriptions.

174.    Several of the letters in the Prior Authorization Toolbox were inherently false, even if submitted for an appropriate patient.  As described above, prior authorization letters contain Defendants' false promotional messages regarding increased patient compliance and adherence with Atelvia, such as "availability of Atelvia will improve adherence to osteoporosis treatment and thereby reduce the incidence of osteoporotic fractures," "Atelvia (risedronate sodium tablets) will help with compliance and absorption," and "Atelvia (risedronate sodium tablets) can be taken directly following breakfast, which greatly improves compliance above all other therapies."

175.    The Toolbox also included a letter to be given to doctors that falsely suggested that Atelvia is approved for men with osteoporosis, pleading with insurers, "[w]e have requested approval of Atelvia . . . Risedronate sodium is the only bisphosphonate approved for men with low bone mass."  Although Actonel is approved as a treatment to increase bone mass in men with osteoporosis, Atelvia is not.  Warner Chilcott's letter, however, was used to deceive insurers and obtain reimbursement for Atelvia on false grounds.

176.    Sales representatives were instructed to carry folders with all the forms and letters from the Prior Authorization Toolbox, as well as a flash drive containing the materials ("in case the office wants an electronic copy") during every call with a doctor or staff.

177.    Sales representatives were encouraged to promote that they could provide assistance to doctors and their medical office staff in gaining prior authorizations from private insurers, even for off-label uses.  For example, an email that Relator's District Manager forwarded to him and the other sales representatives shortly after the Atelvia Launch Meeting

44

listed ICD9 diagnosis codes that representatives "might need it [sic] for a PA or to help your billing staff," including off-label diagnoses.  Although Atelvia is only indicated for postmenopausal osteoporosis, the email encouraged reps to use the ICD9 codes for osteoporosis due to immobilization or inactivity (733.03), as well as drug induced osteoporosis (733.09).

178.    After receiving the email regarding the Prior Authorization Toolbox, Relator again spoke with his manager and challenged the legality of filling out prior authorization forms for physicians as well as use of the Toolbox and the submission of fabricated letters to insurers, but Relator was again told that management said that the practices were fine.

179.    In March of 2011, sales representatives were directed by corporate management to stop filling out physician's prior authorizations.   On information and belief, Warner Chilcott, through local managers, instructed its sales force to continue implementing the Prior Authorization Toolbox program despite the formal announcement by corporate managers that the program had ended.

180.    Private insurers doing business in  California and Illinois reimbursed  Atelvia based  on the false information included in the letters and prior authorization forms Warner Chilcott caused to be submitted.

181.    Warner Chilcott's assistance and participation in filling out prior authorization forms and submitting letters to insurers with false information justifying reimbursement for Atelvia caused the submission of false claims to private insurers in California and Illinois in violation of the CIFPA and IICFPA.

**E.      Defendants Terminated Relator Christopher Wible in Retaliation for His Objections to Illegal Promotional Practices**

182.    As set forth herein, Relator Wible made numerous inquiries and objected to WC's use of the fraudulent MOA story, excessive use of paid dinners and advocate speaker fees, and participation in the completion of fraudulent prior authorization forms to his manager.

183.    The basis of Relator's objections was that WC's use of illegal sales practices could result in the submission of false or fraudulent claims to federal health programs including Medicare and Medicaid.

184.    Many of Relator Wible's numerous objections to Warner Chilcott's illegal activities were voiced directly to managers.   Warner Chilcott knew of Relator's concerns about the fraudulent promotions and that those promotions  led to the submission of false and fraudulent claims.  In the course of his employment, Relator was criticized for his refusal to participate in Warner Chilcott's promotional schemes.

185.    While still employed by Warner Chilcott, Relator made a disclosure of all relevant documents in his possession concerning WC's submission of false or fraudulent claims to federal and state law enforcement authorities including the United States Attorney's Office for the District of Massachusetts, the FBI, the Department of Health and Human Services Office of Inspector General, and numerous state Attorney Generals' offices including in California and Illinois.

186.    On June 27, 2011, Relator Wible filed a complaint alleging Warner Chilcott's ongoing violations of the federal and state false claims acts and damages suffered by federal and state health programs.

187.    In September 2011, Relator Wible traveled from Eugene, Oregon to Boston, Massachusetts, with counsel, to be interviewed by federal and state law enforcement authorities concerning his allegation of knowing submission of false or fraudulent claims caused by Warner Chilcott's illegal promotional activity.

188.    On the same day he was interviewed by federal and state law enforcement authorities, Relator Wible received a message on his cell phone to contact his manager immediately.  On his return to Oregon from Massachusetts, Relator Wible was notified by Warner Chilcott that his employment had been terminated.

189.     On information and belief, Relator Wible's employment was terminated because of his objection to, and refusal to participate in,  Warner Chilcott's fraudulent and illegal promotions.

**Count I**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7**

190.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 189 above as though fully set forth herein.

191.     This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this Count as "the Act").  The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim.  Cal. Ins. Code § 1871.7(b).

192.     Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.  Cal. Ins. Code § 1871.1(e).  The qui tam provision was patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729–32, and the California False Claims Act, Cal. Gov't Code §§ 12650 et seq.

193.     Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550.  Section 550 of the Penal Code prohibits the following activities, among others:

> (a)     It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
> \*       \*       \*       \*       \*       \*
>
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

\*       \*       \*       \*       \*       \*

(b)       It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

194.       By virtue of the acts described in this Complaint, Defendants knowingly presented or caused to be presented, false or fraudulent claims for health care benefits, in violation of Penal Code § 550(a).

195.       By virtue of the acts described in this Complaint, Defendants also concealed and/or failed to disclose information that would have affected the rights of pharmacies to receive reimbursement for prescriptions, in violation of Penal Code § 550(b).

196.       By virtue of the acts described in this Complaint, Defendants knowingly employed "runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance," in violation of Cal. Ins. Code § 1871.7(a).

197.     Each claim for reimbursement that resulted from Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

198.     Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

199.     The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7.  Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.


**Count II**
**Illinois Insurance Claims Frauds Prevention Act**
**740 Ill. Comp. Stat. § 92**

200.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 189 above as though fully set forth herein.

201.     This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92.

202.     Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

203.     Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows:

> A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or

self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company . . .

720 Ill. Comp. Stat. § 5/46-1(a).

204.   Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a qui tam civil action in order to create incentives for private individuals to prosecute violations of the statute.  Subsection 15(a) provides:  "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State."  740 Ill. Comp. Stat. § 92/15(a).

205.   By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act:  knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. § 92/5(b) and 720 Ill. Comp. Stat. § 5/46-1(a).

206.   As a result of such conduct, Defendants have received illegal profits to which they were not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

207.   The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. § 92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count III**
**False Claims Act**
**31 U.S.C. § 3730(h)**

208.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 189 as though fully set forth herein.

50

209.     This is a claim for damages associated with the retaliatory discharge of Relator Wible as provided by the False Claims Act, 31 U.S.C. § 3730(h).

210.     By virtue of the acts described above, Defendants have retaliated against Relator Wible because of lawful acts done in furtherance efforts to stop one or more violations of 31 U.S.C. § 3729 et seq.

## VII.   PRAYER

WHEREFORE, Mr. Wible prays for judgment against the Defendants as follows:

1.     That Defendants cease and desist from violating Cal. Ins. Code §§ 1871, et seq. and 740 Ill. Comp. Stat. § 92 et seq.;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of each claim for compensation submitted by Defendants in violation of Cal. Ins. Code § 1871.7(b), plus a civil penalty of $10,000 for each violation of Cal. Ins. Code § 1871.7(b);

3.     That this Court enter judgment against Defendants in an amount equal to three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. § 92, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 92;

4.     That this Court enter judgment against Defendants and award full compensation to Mr. Wible for his retaliatory discharge under 31 U.S.C. 3730(h);

5.     That Mr. Wible be awarded the maximum amount allowed pursuant to Cal. Ins. Code § 1871.7(g) and 740 Ill. Comp. Stat. § 92/25;

6.     That Mr. Wible be awarded all costs of this action, including attorneys' fees and expenses; and

7.     That Mr. Wible recover such other relief as the Court deems just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Wible hereby demands a trial by jury.

Dated:  April 3, 2014

Respectfully Submitted,

CHRISTOPHER WIBLE,

By His Attorneys,

By:  /s/ Colette G. Matzzie
Colette G. Matzzie
PHILLIPS & COHEN LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@philipsandcohen.com

By:  /s/ David H. Rich
David H. Rich (BBO # 634275)
Todd & Weld LLP
1 Federal Street, 27th Floor
Boston, MA 02109
(617) 720-2626
drich@toddweld.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and accurate copy of the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the following parties listed below, via US Mail, postage prepaid (except as otherwise noted), on this 3rd day of April, 2014.

/s/ Colette G. Matzzie

Colette G. Matzzie

Ronald G. Dove, Jr.
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004

Sonya Rao
Assistant United States Attorney
District of  Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Kamala D. Harris.
Attorney General for the State of California
1300 I Street
POB 944255
Sacramento, CA 94244-2550

Mark Geiger
Director, MFCU
Medicaid Fraud Control Unit of California
Office of the Attorney General
1425 River Park Drive Ste. 300
Sacramento, CA 95815

Raymond Liddy
Deputy Attorney General
Office of the Attorney General
California Department of Justice
1455 Frazee Rd., Ste 315
San Diego, CA  92108

George C. Jepsen

Attorney General
State of Connecticut
55 Elm Street
Hartford, CT 06106

Christopher Godialis
Director, MFCU,
Medicaid Fraud Control Unit of Connecticut
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT 06067

Joseph R. "Beau" Biden, III
Attorney General
Carvel State Office Bldg
820 N. French Street
Wilmington, DE 19801

Christina Showalter
Director, MFCU
Medicaid Fraud Control Unit of Delaware
Office of the Attorney General
820 N French Street, 5th Floor
Wilmington, DE 19801

Pam Bondi
Attorney General for the State of Florida
The Capitol, PL-01
Tallahassee, FL 32399-1050

David Lewis
Chief Assistant Attorney General
Medicaid Fraud Control Unit
Complex Civil Enforcement Bureau
PL-01 The Capitol
Tallahassee, FL 32399-1050

Jeff Atwater
Chief Financial Officer for the State of Florida
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL  32399

Sam Olens
Attorney General for the State of Georgia

40 Capitol Square, SW
Atlanta, GA 30334

Charles Richards,
Director, MFCU
Medicaid Fraud Control Unit
2100 East Exchange Place
Bldg. One, Suite 200
Tucker, GA 30084

David M. Louie
Attorney General for the State of Hawaii
425 Queen Street
Honolulu, HI 96813

Michael L. Parrish
Deputy Attorney General
Medicaid Fraud Control Unit
425 Queen Street
Honolulu, HI  96813

Patrick J. Keenan, Esq,
Bureau Chief, Medicaid Fraud Bureau
Illinois Attorney General's Office
100 W. Randolph St., 12th Floor
Chicago, IL  60601

Greg Zoeller, Esq.
Attorney General
State of Indiana
Attn: Medicaid Fraud Unit
302 W. Washington Street, IGCS - 5th Fl.
Indianapolis, IN 46204

David Thomas
Inspector General of the State of Indiana
315 West Ohio Street
Indianapolis, IN 46202

Allen Pope
Director, MFCU
Medicaid Fraud Control Unit of Indiana
Office of the Attorney General
8005 Castleway Drive
Indianapolis, IN, 46250-1946

Tom Miller
Attorney General of the State of Iowa
1305 E. Walnut Street
Des Moines IA 50319

James D. "Buddy" Caldwell
Attorney General for the State of Louisiana
P.O Box 94005
Baton Rouge, LA 70804

Alan Levine
Secretary, Dept. of Health & Hospitals
628 N. 4th Street
P.O. Box 629
Baton Rouge, LA  70802

Fred A. Duhy, Jr.
Director, MFCU
Medicaid Fraud Control Unit of Louisiana
Office of the Attorney General
P.O. Box 94005
Baton Rouge, LA 70804-9004

Douglas F. Gansler
Attorney General of the State of Maryland
200 St. Paul Place
Baltimore, MD 21202

Ilene J. Nathan
Director, MFCU
Medicaid Fraud Control Unit of Maryland
Office of the Attorney General
200 St. Paul Place, 18th Fl.
Baltimore, MD 21202

Martha Coakley
Attorney General of the State of Massachusetts
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Nathaniel Yeager
Director, MFCU
Medicaid Fraud Control Division
Office of the Attorney General
One Ashburn Place

Boston, MA 02108

Bill Schuette
Attorney General
State of Michigan
G. Mennen Williams Building, 7th Fl.
525 W. Ottawa Street
Lansing, MI 48909

David Tanay
Director, MFCU
Medicaid Fraud Control Unit of Michigan
Office of the Attorney General
2860 Eyde Parkway
East Lansing, MI 48823

Lori Swanson
Attorney General of the State of Minnesota
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101-2131

Tim Fox
Attorney General of the State of Montana
Department of Justice
P.O. Box 201401
Helena, MT 59620-1401

Deborah Fosket
Director, MFCU
Medicaid Fraud Control Unit of Montana
Division of Criminal Investigation
2225 11th Avenue
P.O. Box 201417
Helena, MT 59620-1417

Catherine Cortez Masto
Attorney General of the State of Nevada
Attn:  Medicaid and Fraud Unit
100 North Carson Street
Carson City, NV 89701-4717

Mark N. Kemberling
Director, MFCU
Medicaid Fraud Control Unit of Nevada
Office of the Attorney General

555 East Washington Ave., Ste. 3900
Las Vegas, NV 89101

Joseph A. Foster
Attorney General
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301

Jeffrey S. Cahill
Director, MFCU
Medicaid Fraud Control Unit of New Hampshire
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

John Jay Hoffman
Attorney General of the State of New Jersey
P.O. Box 080
Trenton, NJ  08625-0080

Gary King
Attorney General for the State of New Mexico
P.O. Drawer 1508
Santa Fe, NM 87504-1508

Albert J. Lama
Chief Deputy Attorney General,
Acting Director, MFCU
Medicaid Fraud Control Unit of New Mexico
Office of the Attorney General
PO Drawer 1508
Santa Fe, NM 87504

Eric T. Schneiderman
Office of the Attorney General
The Capitol
Albany, NY 12224-0341

Monica Hickey-Martin
Director, MFCU
Medicaid Fraud Control Unit of New Mexico
Office of the Attorney General
120 Broadway, 13th Fl.
New York, NY 10271

Roy Cooper
Attorney General
Department of Justice
P.O.Box 629
Raleigh, NC 27602-0629

Mark A. Isley
Special Investigator
Assistant Attorney General
State of North Carolina
Medicaid Fraud Investigations Unit
5505 Creedmoor Road, Suite 300
Raleigh, NC  27612

E. Scott Pruitt, Attorney General
State of Oklahoma
313 NE 21st St.
Oklahoma City, OK 73105

Mykel Fry
Assistant Attorney General and
Director, MFCU
Medicaid Fraud Control Unit of Oklahoma
Office of the Attorney General
313 NE 21st St.
Oklahoma City, OK 73105

Peter Kilmartin
Attorney General
150 South Main Street
Providence, RI 02903

James F. Dube
Assistant Attorney General and
Director, MFCU
Medicaid Fraud Control Unit of Rhode Island
Office of the Attorney General
150 S Main St
Providence, RI 02903

Robert E. Cooper, Jr.
Office of the Attorney General and Reporter
State of Tennessee
425 5th Aveneue North
Nashville, TN 37243

Norman Tidwell
Director, MFCU
Medicaid Fraud Control Unit of Tennessee
Bureau of Investigation
901 R.S. Gass Blvd.
Nashville, TN 37216-2639

Office of Greg Abbott
Attorney General for the State of Texas
Attn: Assistant Attorney General Kerry Ascher
300 W. 15th Street, 9th Floor
Austin, TX 78701

W. Rick Copeland
Director, MFCU
Medicaid Fraud Control Unit of Texas
Office of the Attorney General
6330 Hwy 290 East, Suite 250
Austin, TX 78723

Kenneth T. Cuccinelli, II
Attorney General
Commonwealth of Virginia
900 East Main Street,
Richmond, VA 23219

Randall L. Clouse
Director, MFCU
Medicaid Fraud Control Unit of Virginia
Office of the Attorney General
900 East Main Street,
Richmond, VA 23219

J.B. Van Hollen
Attorney General
Wisconsin Department of Justice
Risser Justice Center
P.O. Box 7857
Madison, WI 53707-7857

Tom Storm
Director, MFCU
Medicaid Fraud Control Unit of Wisconsin
Office of the Attorney General
PO Box 7857
Madison WI, 53707-7857

Irvin B. Nathan
Attorney General for the District of Columbia
441 4th Street,NW
Washington, DC 20001

Ms. Susan Bieber Kennedy
Director for Medicaid Fraud Control Unit and
Special Assistant United States Attorney
  for the District of Columbia
717 14th St., NW, 5th Floor
Washington, DC 20005

Gene Woo
Senior Staff Counsel
California Department of Insurance
Fraud Liason Bureau
45 Fremont Street, 24th Floor
San Francisco, CA 94105

Dalila P. A. Bentley
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, IL 60601

Malini Rao
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, IL 60601